**E.I. DU PONT DE NEMOURS & COMPANY, Petitioner,**

v.

**FEDERAL TRADE COMMISSION, Respondent.**

**ETHYL CORPORATION, Petitioner,**

v.

**FEDERAL TRADE COMMISSION, Respondent.**

**Nos. 413, 414, Dockets 83–4102, 83–4106.**

United States Court of Appeals, Second Circuit.

Argued Nov. 21, 1983.

Decided Feb. 23, 1984.

Daniel M. Gribbon, Washington, D.C. (Allan J. Topol, Jeffrey E. Stake, Covington & Burling, Washington, D.C., W.E. MacIntyre, G.E. Kandler, Wilmington, Del., of counsel), for petitioner E.I. Du Pont de Nemours & Co.

David F. Peters, Richmond, Va. (Joseph C. Carter, Jr., Thomas G. Slater, Jr., William F. Young, Donald R. Schmidt, Hunton & Williams, Richmond, Va., E. Whitehead Elmore, Richmond, Va., of counsel), for petitioner Ethyl Corp.

Howard E. Shapiro, Deputy Gen. Counsel, F.T.C., Washington, D.C. (John H. Carley, Gen. Counsel, Thomas J. Keary, Stephen C. Palmer, Peter M. Kazon, Frederick E. Dooley, Attys., F.T.C., Washington, D.C., of counsel), for respondent F.T.C.

Chadwell & Kayser, Ltd., Chicago, Ill. (James F. Lambe, Gen. Counsel, Champ W. Davis, Jr., David C. Bogan, Oak Brook, Ill., of counsel), for amicus curiae Nalco Chemical Co.

Roger Boyle, New York City (Boyle, Vogeler & Haimes, New York City, David Crump, Houston, Tex., of counsel), for amicus curiae The Legal Foundation of America.

Miles W. Kirkpatrick, Washington, D.C. (Michael S. Kelly, Michael F. Clayton, Washington, D.C., John W. Thomas, Pitts-

burgh, Pa., of counsel), for amicus curiae PPG Industries, Inc.

Before LUMBARD, MANSFIELD and KEARSE, Circuit Judges.

MANSFIELD, Circuit Judge:

E.I. Du Pont De Nemours and Company ("Du Pont") and Ethyl Corporation ("Ethyl"), the nation's two largest manufacturers of lead antiknock gasoline additives, petition this court pursuant to § 5(c) of the Federal Trade Commission Act, 15 U.S.C. § 45(c), to review and set aside a final order of the Federal Trade Commission ("FTC") entered with an accompanying opinion on April 1, 1983. The FTC held that Du Pont, Ethyl and two other antiknock compound manufacturers, PPG Industries, Inc. ("PPG") and Nalco Chemical Company ("Nalco"), had engaged in unfair methods of competition in violation of § 5(a)(1) when each firm independently and unilaterally adopted at different times some or all of three business practices that were neither restrictive, predatory, nor adopted for the purpose of restraining competition. These challenged practices were: (1) the sale of the product by all four firms at a delivered price which included transportation costs, (2) the giving by Du Pont and Ethyl of extra advance notice of price increases, over and above the 30 days provided by contract, and (3) the use by Du Pont and Ethyl (and infrequently by PPG) of a "most favored nation" clause under which the seller promised that no customer would be charged a higher price than other customers.[1] The Commission reasoned that, although the petitioners' adoption of these practices was non-collusive, they collectively had the effect, by removing some of the uncertainties about price determination, of substantially lessening competition by facilitating price parallelism at non-competitive levels higher than might have otherwise existed.[2] The order is set aside.

Lead-based antiknock compounds have been used in the refining of gasoline since the 1920s. The compounds are essentially homogeneous, consisting in part of tetraethyl lead (TEL), originally produced in the 1920s, and tetramethyl lead (TML), first produced in 1960. They are now usually sold as mixtures, sometimes with additives. The compounds are added to gasoline to prevent "knock," i.e., premature detonation in a gasoline engine's cylinders. Resistance to knock is measured by octane ratings; for a gasoline refiner use of lead-based antiknock mixtures is the most economical way to raise the octane rating of gasoline for vehicles that take leaded gas. Since the compounds are highly toxic and volatile, great care must be taken in transporting and storing them. Refiners therefore maintain only limited inventories. Since an uninterrupted supply is important, the refiner usually purchases the compounds periodically from at least two antiknock producers pursuant to one-year contracts.

From the 1920s until 1948, Ethyl was the sole domestic producer of antiknock compounds. Demand for the compounds increased with the increase in gasoline use, however, and in 1948 Du Pont entered the industry and captured a substantial market share. In 1961 PPG (then known as Houston Chemical Company) began to manufacture and sell the compounds; and in 1964 Nalco followed suit. By 1974, Du Pont had 38.4% of the market; Ethyl 33.5%; PPG 16.2%; and Nalco 11.8%. During 1974–

---

1. Section 5 provides in pertinent part: "Unfair methods of competition in or affecting commerce, and unfair or deceptive acts or practices in or affecting commerce, are declared unlawful." 15 U.S.C. § 45(a)(1).

2. The Commission stated:

"Section 5 prohibits practices by individual firms which can be shown to have a significant adverse effect on competition by promoting price uniformity at supracompetitive levels, although this result is accomplished without evidence of an explicit agreement.... [E]vidence of the actual effect of the facilitating practices is a necessary element prior to any finding of liability.... Therefore, facilitating practices by individual firms will be found to violate § 5 as unfair methods of competition only if the weight of the evidence shows that competition has been substantially lessened."

1979, the period of the alleged violations, these were the only four domestic producers and sellers of the compounds. No other firm has ever made or sold the compounds in this country. Thus the industry has always been highly concentrated. However, there are no technological or financial barriers to new entries.

The only purchasers of lead antiknocks are the gasoline refining companies which are large, aggressive and sophisticated buyers. Indeed, several are among the largest industrial corporations in the world.[3] If prospective profits from the sale of antiknock compounds were sufficiently attractive, nothing would prevent them from integrating backwards into the antiknock industry. Of the 154 refiners who purchase the product, the ten largest buy about 30% of the total amount produced in this country.

The steady increase in demand for antiknock compounds during the 1960s allowed PPG and Nalco to enter the market. From August 1971 to January 1974, however, federal controls froze the price of the compounds and beginning in 1973 the federal government initiated steps that were to lead to a drastic reduction in demand. At that time the Environmental Protection Agency ("EPA") required that all automobiles made in the United States, beginning in 1975, be equipped with catalytic converters; since the lead in antiknock compounds fouls such converters, almost all new cars produced since 1975 require unleaded gasoline. At about the same time, in order to reduce the amount of lead in the atmosphere the EPA imposed severe limitations on the amount of lead that could be used in gasoline. As a result of these two measures the use of lead antiknock compounds sharply declined from more than one billion pounds in 1974 to approximately 400 million pounds in 1980, leaving manufacturers with excess capacity. Additional EPA regulations are likely to cause a further decline in the use of the product from an estimated 260 million pounds in 1985 to an estimated 90 million pounds in 1990.

Thus, even though there are no technological or financial constraints barring new entries into the industry and there were two new entrants during the 1960s, the cost of staying in production in a dying industry has made it unlikely that there will be new entrants in the future. The problem confronted by existing producers is the same as that faced by potentially new entrants. Indeed, PPG has recently ceased production of lead antiknock compounds, leaving only three manufacturers in this evaporating line of business.[4]

The lifting of the price freeze on antiknock compounds in 1974 led, as in other industries, to a series of price increases, some compensating for the long period during which prices had been frozen and some reflecting increases in the cost of raw materials used by some antiknock producers (e.g., magnesium, sodium, electricity). Of the 30 list price changes during the 1974–1979 period, 6 were decreases. Of the remaining 24 increases, 20 followed public announcements of increases in the price of raw lead which antiknock producers must buy. Moreover, on 6 occasions the antiknock producers independently announced non-identical price increases.

The antiknock market, regardless of the price of the product, remained inelastic. In the face of a declining demand a price cut would not increase total industry sales. Nor would a price increase reduce total industry sales. Lead antiknocks at higher prices were still more efficient and economical than alternative methods of raising octane levels of gasoline and the compound accounted for a very small percentage of the total cost of the gasoline. The record reveals that, although some of the larger refiners sought to obtain price or other concessions from the producers, the refin-

---

3. These include Exxon Corp., Texaco Corp., Mobil Oil Co., Gulf Oil Co., Amoco and Chevron.

4. The record does not disclose the reason for PPG's termination of the production of antiknocks. One would expect that if its profits were "supracompetitive," as the FTC asserts, PPG would have remained or sold its facilities to a new entrant.

ers were not disturbed by the price increases. For instance, a purchasing agent for Exxon Corp., one of the largest buyers, testified:

"We think it's [respondents' antiknock fluid] a bargain. Even though we fuss at our vendors a lot, it really is a bargain for us as far as achieving higher quality at a lower price."

One reason for this complacent attitude, as the Administrative Law Judge ("ALJ") found, was that the cost of the compound per gallon of gasoline was "minimal." Indeed, there was no evidence that the price increases had any impact on the price of gasoline.

These characteristics of the industry—high concentration, small likelihood of new entries because of a sharply declining market, inelastic demand, and homogeneity of product—led to a natural oligopoly with a high degree of pricing interdependence in which there was far less incentive to engage in price competition than if there had been many sellers in an expanding market. Although a manufacturer in an inelastic market can temporarily capture an increased market share by price reductions or secret discounts, the reductions or discounts are usually discovered and met sooner or later by some form of competition by the other producers without increasing the volume of total sales in the market. *See United States v. United States Gypsum Co.,* 438 U.S. 422, 456, 98 S.Ct. 2864, 2883, 57 L.Ed.2d 854 (1978). The sole effect of a price reduction in a declining, inelastic market, therefore, is to reduce the industry's total profits. For these reasons Du Pont and Ethyl (as distinguished from PPG and Nalco) each independently chose not to offer price discounts, which they believed would be unprofitable. Du Pont instead decided to raise its prices by an amount that would offset its increasing costs and in addition yield a 20% pre-tax return on investment. As a result, during the 1970s, profits in the industry—particularly Du Pont's and Ethyl's—were substantially greater than what is described as the benchmark in the chemical industry, which in this case is 150% of

the average rate of return in that industry. During the 1974–1979 period under investigation by the FTC, the returns of Ethyl and Du Pont on investment substantially exceeded the 150% benchmark in each year; although PPG's and Nalco's returns on investment also exceeded the 150% benchmark in four of the five years, PPG operated at a loss in 1979 and in 1983 ceased production.

Notwithstanding the highly concentrated structure of the industry, there was substantial price and non-price competition during the 1974–1979 period that is the subject of the complaint. More than 80% of Nalco's sales during that period were at discounts off its list price, and more than one-third of PPG's sales during the same period were at discounts, rising to 58% of its sales in 1979. Despite the fact that the compounds were sold by all four firms on a delivered price basis, the record reveals that, because of the variations in secret discounts granted by Nalco to its customers, the other 3 producers were uncertain as to Nalco's strategy and the net prices actually received by it. Du Pont, for example, was unclear whether Nalco always followed price increases or even had a price list. Ethyl was unsure whether Nalco sometimes sold to certain customers on an f.o.b. basis. Nalco's discounting led to a substantial decline in the list price of TML and eventually to the elimination of the previous price differential between TML and TEL which had existed for many years.

Ethyl and Du Pont, apparently recognizing the futility of meeting price discounts in an inelastic, declining market, each individually chose to meet this price competition on the part of PPG and Nalco not by price discounts but by various forms of non-price competition. These included late billing and "advance buying," the latter of which permitted customers to order extra volume at the old price before a price increase went into effect. Du Pont and Ethyl also provided valuable "free" services, including (1) provision of free equipment, (2) education on how to use the product more efficiently, (3) assistance in building

and monitoring facilities for the storage and blending of antiknock compounds, (4) computer programming assistance, (5) training of refiners' employees, (6) payment for consultant services, and (7) favorable credit terms. These competitive practices, according to the ALJ, "played a significant role in the competitive rivalry between the antiknock suppliers" and were responsible for a 35% increase in sales by one respondent to 10 sizeable customers in 1975 over the previous year.

When services are included, the total pricing package offered by each producer varied substantially from that offered by others. Moreover, these services were much more difficult for a competitor to detect than straight price changes which are discovered overnight. Indeed the ALJ found that it would take "a major accounting project" to measure the value of these non-price competitive practices in terms of price. As a result, although the market shares of the competitors did not significantly change during the relevant period, there were numerous shifts by customers from one producer to another.

On May 30, 1979, the FTC filed a complaint against the four manufacturers, alleging that each of the companies had engaged in "unfair methods of competition" and "unfair acts and practices" in violation of § 5 of the Act. The complaint attacked the following non-collusive practices: (1) the sale of lead antiknock additives by each respondent only on the basis of a delivered price that included the cost of transportation; (2) the use by Du Pont and Ethyl of "most favored nation" clauses in their standard form sales contracts and the use of such clauses by Nalco in a substantial number of its sales contracts; (3) the use by each company of contract clauses requiring at least 30 days advance notice to customers of changes in price; and (4) providing advance notice of price increases to the press. The complaint did not claim that the practices were the result of any agreement, express or tacit, among the manufacturers or that the practices had

been undertaken for other than legitimate business purposes. It simply alleged that the practices "individually and in combination had the effect of reducing uncertainty about competitors' prices of lead-based antiknock compounds," and that such reduced uncertainty "unfairly facilitated the maintenance of substantial, uniform price levels and the reduction or elimination of price competition in the lead-based antiknock market."

Each of the challenged practices was initiated by Ethyl during the period prior to 1948 when it was the sole producer in the industry. There is no suggestion that the practices constituted unfair methods of competition at that time. For example, Ethyl began quoting prices on a delivered basis in 1937 in response to customer demand. Each of the three subsequent manufacturers, upon entry into the market, followed that practice. There is no evidence that the practice was adopted by any of the respondents for other than legitimate business reasons, the principal of which were tradition and customer demand.[5] Customers demanded a delivered price because it would require the manufacturers to retain title to and responsibility for the dangerously volatile compounds during transit to the refiner's plant and in at least some cases would result in savings on state transportation and inventory taxes which the customer would pay if title passed prior to delivery. It is undisputed that, as the ALJ found, the delivery charge is a very small factor in relation to the sales price of the compounds. In 1979, for instance, average delivery costs to respondents' customers amounted to $1.53 cents per pound or less than 2% of list price, hardly a substantial competitive factor.

At trial the FTC offered no expert freight witnesses or other proof regarding the effect of delivered pricing on price competition. Du Pont's expert witness, who had extensive experience in f.o.b. pricing and who was the only witness to testify on the subject, stated that even without uniform delivered pricing (i.e., if antiknocks

---

**5.** The ALJ found that delivered pricing was based on "some legitimate business reasons."

were sold f.o.b.) published freight tariffs would allow each manufacturer easily to determine any other manufacturer's freight prices to each customer and to match those prices to the penny.

Similarly, Ethyl adopted the "most favored nation" contractual clause more than fifty years ago when it was the sole producer of antiknocks as a guarantee against price discrimination between its own customers who competed against each other in the sale of gasoline containing antiknock compounds. The clause assured the smaller refiners that they would not be placed at a competitive disadvantage on account of price discounts to giants such as Standard Oil, Texaco and Gulf. For the same legitimate business reason Du Pont adopted the same contractual clause when it later entered the industry. Even though such clauses arguably reduce price discounting, they comport with the requirements of the Robinson-Patman Act, 15 U.S.C. § 13 et seq., which prohibits price discrimination between customers. There is no evidence that Ethyl or Du Pont adopted or continued to use the most favored nation clause for the purpose of influencing the price discounting policies of other producers or of facilitating their adoption of or adherence to uniform prices. Indeed, PPG did not include the clause in its standard contract with customers and the complaint did not charge it with engaging in this practice. Nalco made only limited use of the clause.

Finally, the issuance of advance notice of price increases both to buyers and to the press, a common practice in the chemical industry, was initiated by Ethyl, well before the entry of Du Pont or the other two manufacturers into the market, as a means of aiding buyers in their financial and purchase planning. The contract clause used by two producers (Ethyl and Nalco) required them to give 30 days notice to the customer of price changes, while the clause used by the others (Du Pont and PPG) was limited to price increases. Du Pont and

Ethyl gave customers a few days additional notice of their price increases (sometimes called a "grace period") but Nalco did not do so and PPG did not do so in any price increase that it initiated. Although the advance noticing had the indirect effect of informing competitors as to the producer's price increases, the record, not surprisingly, contains considerable proof that in such a small industry manufacturers quickly learn of competitors' price changes, usually within hours, regardless of the advance public notice. Typically, when one producer changed its price and communicated that change to its buyers, those buyers would immediately call the other producers to secure the best price. Moreover, the giving of 30 or more days advance notice of a price increase did not preclude the initiator, upon finding that competitors did not follow, from rescinding or modifying the increase or extending its effective date at any time prior to the end of the 30-day period.[6]

Following extensive hearings before the ALJ, the ALJ on August 5, 1981, filed a 173-page Initial Decision finding that the alleged practices, which were not disputed, constituted both "unfair methods of competition" and "unfair acts and practices" in violation of § 5. He entered an order prohibiting advance notice of price increases, uniform delivered prices, use of "most favored nation" clauses by Du Pont and Ethyl, and limiting announcements of price increases to the press and others.

Upon appeal the FTC, by a 3–1 margin with Chairman Miller dissenting, on March 22, 1983, issued a 119-page Final Order and Opinion finding that Du Pont and Ethyl had engaged in "unfair methods of competition" through the combined use of the "most favored nation" contractual clauses, uniform delivered pricing, and extra advance notice to customers of price increases beyond the 30-day contractual period. PPG and Nalco were found to have violated

---

**6.** An example was Du Pont's giving of a 30-day notice of a price increase in August 1977 without any additional advance, or grace period, notice. When Ethyl thereafter undercut Du

Pont's increased by adopting a lesser increase Du Pont rolled back its increase to the lesser competitive amount rather than sell at its proposed higher price.

§ 5 only with regard to the use of uniform delivered pricing. The Commission acknowledged that § 5 of the Act does not prohibit independent pricing by individual firms, even at high levels, in an oligopolistic industry. Yet, the Commission took the view that because § 5 is not confined to the strictures of the Sherman and Clayton Acts but prohibits a broader range of conduct, it can be violated even in the absence of agreement if the firms engage in interdependent conduct that, because of the market structure and conditions, facilitates price coordination in a way that substantially lessens competition in the industry.

As support for its theory the Commission relied upon the legislative history of § 5, certain prior decisions dealing with its challenges to basing point pricing schemes, and general statements of the Supreme Court and commentators regarding the reach of § 5. Rejecting petitioners' contention that § 5 liability requires a showing of at least a tacit agreement, the Commission articulated what it called a "rule of reason" test whereby unilateral business practices could violate the Act if the structure of the industry rendered it susceptible to anticompetitive price coordination, if there was substantial evidence of actual noncompetitive performance, and if there was no "pro-competitive" justification offsetting the harmful effect of the practices.

The Commission concluded from its examination of the record that the structure of the antiknock industry—high concentration, high barriers to entry, a homogeneous product, and inelastic demand—rendered it susceptible to unilateral but interdependent conduct which lessened competition. The Commission further decided that the record contained substantial evidence of noncompetitive performance in the industry: highly uniform prices and price changes, limited price discounting, stable market shares, relatively high profits, prices in excess of marginal cost, and rising prices despite excess capacity and sluggish demand. On such a record, the FTC held that unilateral but interdependent practices engaged in by the petitioners constituted an unfair method of competition in violation of § 5. Conceding that the challenged practices each had a legitimate business purpose, the Commission concluded nevertheless that the anticompetitive effect of those practices rendered them unlawful. Specifically rejected by the majority were the ALJ's findings that the practices also constituted "unfair acts and practices" under § 5 and that the contractual requirement of 30 days advance notice to buyers of price increases and the press announcements of such price increases were unlawful. Thus, the Commission found that giving buyers 30 days advance notice of price increases was not unlawful but giving buyers a few more days advance notice of price increases was an unfair method of competition. Furthermore, even though none of the practices by itself was an unfair method of competition, and none of the practices was undertaken in agreement with the other manufacturers, the FTC concluded that their cumulative effect was to reduce competition and that the practices thus constituted unfair methods of competition in violation of the Act.

The FTC issued a cease and desist order only against Ethyl and Du Pont, prohibiting them from announcing price changes prior to the 30-day contractual period and from using "most favored nation" clauses in their sales contracts. The order also required Ethyl and Du Pont to afford their customers the option of purchasing antiknock additives at a "point of origin" price. The Commission did not prohibit the use of press releases or the 30-day advance notice of price increases. No order was entered against PPG because that company has withdrawn from the industry and no order was entered against Nalco because of the Commission's conclusion that Nalco was unlikely to be an initiator of price increases.

## DISCUSSION

■ The essential question is whether, given the characteristics of the antiknock industry, the Commission erred in holding that the challenged business practices con-

stitute "unfair methods of competition" in violation of § 5 simply because they "facilitate" consciously parallel pricing at identical levels. The question goes to the scope of the Commission's power. Although its interpretation of § 5 is entitled to great weight, *FTC v. Texaco, Inc.,* 393 U.S. 223, 226, 89 S.Ct. 429, 431, 21 L.Ed.2d 394 (1968); *FTC v. Motion Picture Advertising Service Co.,* 344 U.S. 392, 396, 73 S.Ct. 361, 364, 97 L.Ed. 426 (1953); *FTC v. Cement Institute,* 333 U.S. 683, 720, 68 S.Ct. 793, 812, 92 L.Ed. 1010 (1948), and its power to declare trade practices unfair is broad, *FTC v. Brown Shoe Co.,* 384 U.S. 316, 320–22, 86 S.Ct. 1501, 1503, 16 L.Ed.2d 587 (1966), it is the function of the court ultimately to determine the scope of the statute upon which the Commission's jurisdiction depends. *FTC v. Texaco, Inc., supra,* 393 U.S. at 226, 89 S.Ct. at 431; *FTC v. R.F. Keppel & Bro., Inc.,* 291 U.S. 304, 314, 54 S.Ct. 423, 427, 78 L.Ed. 814 (1934); *FTC v. Beech-Nut Packing Co.,* 257 U.S. 441, 453, 42 S.Ct. 150, 154, 66 L.Ed. 307 (1922); *Ger-Ro-Mar, Inc. v. FTC,* 518 F.2d 33, 38 (2d Cir.1975).

Congress' use of the vague general term "unfair methods of competition" in § 5 without defining what is "unfair" was deliberate. The statute's legislative history reveals that, in reaction to the relatively narrow terms of the Sherman Act as limited by the Supreme Court's adoption of the Rule of Reason in *Standard Oil Co. v. United States,* 221 U.S. 1, 31 S.Ct. 502, 55 L.Ed. 619 (1911), Congress sought to provide broad and flexible authority to the Commission as an administrative body of presumably practical men with broad business and economic expertise in order that they might preserve business' freedom to compete from restraints. Congress' aim was to protect society against oppressive anti-competitive conduct and thus assure that the conduct prohibited by the Sherman and Clayton Acts would be supplemented as necessary and any interstices filled. *Report of the Conference Committee,* H.R. Rep. No. 1142, 63d Cong., 2d Sess. 19 (1914); *see also Atlantic Refining Co. v. FTC,* 381 U.S. 357, 367, 85 S.Ct. 1498, 1505,

14 L.Ed.2d 443 (1965); *FTC v. Motion Picture Advertising Service Co.,* 344 U.S. 392, 394, 73 S.Ct. 361, 363, 97 L.Ed. 426 (1953). Indeed, Congress, in the process of drafting § 5, gave up efforts to define specifically which methods of competition and practices are competitively harmful and abandoned a proposed laundry list of prohibited practices for the reason that there were too many practices to define and many more unforeseeable ones were yet to be created by ingenious business minds. *Report of the Senate Committee on Interstate Commerce,* S.Rep. No. 597, 63d Cong., 2d Sess. 13 (1914); *Report of the Conference Committee,* H.R.Rep. No. 1142, 63d Cong., 2d Sess. 19 (1914). The specific practices that might be barred were left to be defined by the Commission, applying its expertise, subject to judicial review. Congress did not, however, authorize the Commission under § 5 to bar any business practice found to have an adverse effect on competition. Instead, the Commission could proscribe only "unfair" practices or methods of competition. Review by the courts was essential to assure that the Commission would not act arbitrarily or without explication but according to definable standards that would be properly applied.

■ During the period since the enactment of the Federal Trade Commission Act the courts have established certain principles bearing on the scope of the Commission's powers. Although the Commission may under § 5 enforce the antitrust laws, including the Sherman and Clayton Acts, *FTC v. Motion Picture Advertising Service Co.,* 344 U.S. 392, 395, 73 S.Ct. 361, 363, 97 L.Ed. 426 (1953), *FTC v. Cement Institute,* 333 U.S. 683, 693, 68 S.Ct. 793, 799, 92 L.Ed. 1010 (1948), it is not confined to their letter. It may bar incipient violations of those statutes, *FTC v. Brown Shoe Co.,* 384 U.S. 316, 321–22, 86 S.Ct. 1501, 1504, 16 L.Ed.2d 587 (1966), *Fashion Originators' Guild v. FTC,* 312 U.S. 457, 463, 61 S.Ct. 703, 706, 85 L.Ed. 949 (1941), and conduct which, although not a violation of the letter of the antitrust laws, is close to a

violation or is contrary to their spirit, *FTC v. Sperry & Hutchinson Co.*, 405 U.S. 233, 239, 92 S.Ct. 898, 903, 31 L.Ed.2d 170 (1972); *Atlantic Refining Co. v. FTC*, 381 U.S. 357, 369–71, 85 S.Ct. 1498, 1506–1507, 14 L.Ed.2d 443 (1965); *FTC v. Beech-Nut Packing Co.*, 257 U.S. 441, 453, 42 S.Ct. 150, 154, 66 L.Ed. 307 (1922); *Grand Union Co. v. FTC*, 300 F.2d 92, 98–99 (2d Cir.1962). In prosecuting violations of the spirit of the antitrust laws, the Commission has, with one or two exceptions, confined itself to attacking collusive, predatory, restrictive or deceitful conduct that substantially lessens competition.[7]

■ The Commission here asks us to go further and to hold that the "unfair methods of competition" provision of § 5 can be violated by non-collusive, non-predatory and independent conduct of a non-artificial nature, at least when it results in a substantial lessening of competition. We recognize that § 5 invests the Commission with broad powers designed to enable it to cope with new threats to competition as they arise. As the Supreme Court stated in *FTC v. Sperry & Hutchinson Co.*, 405 U.S. 233, 244, 92 S.Ct. 898, 905, 31 L.Ed.2d 170 (1972):

"Thus, legislative and judicial authorities alike convince us that the Federal Trade Commission does not arrogate excessive power to itself if, in measuring a practice against the elusive, but congressionally mandated standard of fairness, it, like a court of equity, considers public values beyond simply those enshrined in the letter or encompassed in the spirit of the antitrust laws." (Footnote omitted).

However, as the Court noted in the same case, appropriate standards must be adopted and applied to protect a respondent against abuse of power. 405 U.S. at 248, 92 S.Ct. at 907. As the Commission moves away from attacking conduct that is either a violation of the antitrust laws or collusive, coercive, predatory, restrictive or deceitful, and seeks to break new ground by enjoining otherwise legitimate practices, the closer must be our scrutiny upon judicial review. A test based solely upon restraint of competition, even if qualified by the requirement that the conduct be "analogous" to an antitrust violation, is so vague as to permit arbitrary or undue government interference with the reasonable freedom of action that has marked our country's competitive system.

The term "unfair" is an elusive concept, often dependent upon the eye of the beholder.[8] A line must therefore be drawn

---

7. Examples of conduct successfully attacked by the FTC as violative of § 5 have been a manufacturer's use of its economic power over its dealers to coerce them into buying tires, batteries or accessories only from those who paid the manufacturer a commission, *FTC v. Texaco, Inc.*, 393 U.S. 223, 89 S.Ct. 429, 21 L.Ed.2d 394 (1968); *Atlantic Refining Co. v. FTC*, 381 U.S. 357, 85 S.Ct. 1498, 14 L.Ed.2d 443 (1965); offering special benefits to dealers who agreed to exclude competing product lines, *FTC v. Brown Shoe Co.*, 384 U.S. 316, 86 S.Ct. 1501, 16 L.Ed.2d 587 (1966); scheming to control prices by cutting off supplies to those selling at a discount, *FTC v. Beech-Nut Packing Co.*, 257 U.S. 441, 42 S.Ct. 150, 66 L.Ed. 307 (1922), participating in collective action to eliminate price competition, *FTC v. National Lead Co.*, 352 U.S. 419, 77 S.Ct. 502, 1 L.Ed.2d 438 (1957), *FTC v. Cement Institute*, 333 U.S. 683, 68 S.Ct. 793, 92 L.Ed. 1010 (1948), *Sugar Institute, Inc. v. United States*, 297 U.S. 553, 56 S.Ct. 1629, 80 L.Ed. 859 (1935), marketing inferior goods to children through use of a gambling scheme, *FTC v. R.F. Keppel & Bro., Inc.*, 291 U.S. 304, 54 S.Ct. 423, 78 L.Ed. 814 (1934), or inducing use of exclusive dealing contracts that are restrictive in character, *FTC v. Motion Picture Advertising Service Co.*, 344 U.S. 392, 73 S.Ct. 361, 97 L.Ed. 426 (1953).

8. Two decisions heavily relied on by the Commission, *Triangle Conduit & Cable Co. v. FTC*, 168 F.2d 175 (7th Cir.1948), *aff'd by an equally divided court sub nom., Clayton Mark & Co. v. FTC*, 336 U.S. 956, 69 S.Ct. 888, 93 L.Ed. 1110 (1949), and *Boise Cascade Corp. v. FTC*, 637 F.2d 573 (9th Cir.1980), are not of assistance in resolving the issue before us. In *Triangle Conduit* the FTC had found that the use of a mathematical formula by members of a trade association to compute delivered price amounted to both a conspiracy to fix prices and an unfair method of competition in violation of § 5. Upon appeal the Seventh Circuit held that the conspiracy had been proved by circumstantial evidence. 168 F.2d at 180. Although it went on to state in reliance on *FTC v. Cement Institute, supra,* that it could not "say the Commission was wrong in concluding that the individual use of the basing point method ... does constitute an unfair method of competition," *id.* at 181, the finding

between conduct that is anticompetitive and legitimate conduct that has an impact on competition. Lessening of competition is not the substantial equivalent of "unfair methods" of competition. Section 5 is aimed at conduct, not at the result of such conduct, even though the latter is usually a relevant factor in determining whether the challenged conduct is "unfair." Nor does the statute obligate a business to engage in competition; if that were the case, many acceptable pricing and market decisions would be barred. A manufacturer, for instance, would be prevented from making a concededly lawful change in its distribution system, designed to increase sales efficiency, by unilaterally reducing the number of its wholesalers, since the effect would be to diminish substantial competition at the wholesaler level. Similarly, if anticompetitive impact were the sole test, the admittedly lawful unilateral closing of a plant or refusal to expand capacity could be found to be "unfair." The holder of a valid product patent could be prevented from exercising its lawful monopoly to charge whatever the traffic would bear, even though "a monopolist, as long as he has no purpose to restrain competition or to enhance or expand his monopoly, and does not act coercively, retains [the right to trade with whom he wishes]." *Official Airline Guides, Inc. v. FTC*, 630 F.2d 920, 927–28 (2d Cir.1980), *cert. denied*, 450 U.S. 917, 101 S.Ct. 1362, 67 L.Ed.2d 343 (1981); *see United States v. Colgate & Co.*, 250 U.S. 300, 307, 39 S.Ct. 465, 468, 63 L.Ed. 992 (1919).

■ When a business practice is challenged by the Commission, even though, as here, it does not violate the antitrust or other laws and is not collusive, coercive, predatory or exclusionary in character, standards for determining whether it is "unfair" within the meaning of § 5 must be formulated to discriminate between normally acceptable business behavior and conduct that is unreasonable or unacceptable. Otherwise the door would be open to arbitrary or capricious administration of § 5; the FTC could, whenever it believed that an industry was not achieving its maximum competitive potential, ban certain practices in the hope that its action would

of a conspiracy sheds doubt on the significance of the latter statement. Indeed, a majority of the Commission took the view that *Cement Institute* and *Triangle Conduit* apply only to "conspiracy situations." *Interim Report on the Study of the Federal Trade Commission Pricing Policies*, S.Doc. No. 27, 81st Cong., 1st Sess. 62–63 (1949). The Commission's failure thereafter for over 30 years to seek to apply § 5 to consciously parallel behavior not involving collusion, coercion or restrictive conduct indicates that it believed it has no power to curb otherwise legitimate behavior allegedly facilitating conscious price parallelism. *See BankAmerica Corp. v. United States*, — U.S. —, 103 S.Ct. 2266, 76 L.Ed.2d 456 (1983).

*Boise Cascade Corp.* is at best ambiguous. There the FTC alleged that plywood manufacturers, acting individually, had adopted a freight pricing scheme that lessened competition in the industry. The pricing scheme, use of a West Coast freight factor for determining freight prices from southern shipping points, was alleged to have resulted in an "artificial" method of calculating freight prices, contributing to pricing uniformity of southern plywood. The FTC argued that even though there was no agreement, there was liability because of the anticompetitive effect. The Ninth Circuit set aside the FTC order, finding no anticompetitive

effect. The FTC in the instant case relies upon the following statement by the court:

"We thus hold that in the absence of evidence of overt agreement to utilize a pricing system to avoid price competition, the Commission must demonstrate that the challenged pricing system has actually had the effect of fixing or stabilizing prices. Without such effect, a mere showing of parallel action will not establish a section 5 violation." 637 F.2d at 577

Standing alone, the statement tends to support the Commission's position here, particularly since a finding of price conspiracy would obviate the necessity of proving that it had the effect of fixing or stabilizing prices. But earlier in the same paragraph the court stated:

"It is important to stress that the weight of the case law and the Commission's own policy statement make it clear that we are looking for at least tacit agreement to use a formula which has the effect of fixing prices. Indeed, none of the delivered pricing cases support a finding of a section 5 violation for the bare existence of an industry-wide artificial freight factor. In each case, the system had been utilized, tacitly or overtly, to match prices and avoid price competition." *Id.* at 576–77.

In view of this statement we cannot place much reliance on *Boise Cascade* as support for the Commission's position here.

increase competition. The mere existence of an oligopolistic market structure in which a small group of manufacturers engage in consciously parallel pricing of an identical product does not violate the antitrust laws. *Theatre Enterprises, Inc. v. Paramount Film Distributing Corp.*, 346 U.S. 537, 74 S.Ct. 257, 98 L.Ed. 273 (1954). It represents a condition, not a "method;" indeed it could be consistent with intense competition. Labelling one producer's price change in such a market as a "signal," parallel price changes as "lock-step," or prices as "supracompetitive," hardly converts its pricing into an "unfair" method of competition. To so hold would be to condemn any such price increase or moves, however independent; yet the FTC has not suggested that § 5 authorizes it to ban all price increases in an oligopolistic market. On the contrary, it states that "Section 5 should not prohibit oligopolistic pricing *alone*, even supracompetitive parallel prices, in the absence of specific conduct which promotes such a result." (Emphasis in original). This fine distinction creates doubt as to the types of otherwise legitimate conduct that are lawful and those that are not. The doubt is increased by the Commission's concession that price uniformity is normal in a market with few sellers and homogeneous products, such as that in the antiknock compound industry.

In view of this patent uncertainty the Commission owes a duty to define the conditions under which conduct claimed to facilitate price uniformity would be unfair so that businesses will have an inkling as to what they can lawfully do rather than be left in a state of complete unpredictability. The Commission's decision in the present case does not provide any guidelines; it would require each producer not only to assess the general conduct of the antiknock business but also that of each of its competitors and the reaction of each to the other, which would be virtually impossible. Some idea of the fickleness and uncertainty of the FTC's position in the present case can be gathered from its ambivalent view towards some of the practices which it attacks. Certain otherwise-legitimate practices were declared unlawful only when used cumulatively with other practices. Others were found unfair when used by certain producers (Du Pont and Ethyl) but not when used by others (PPG and Nalco). Press announcements of price increases and contractual 30-day price increase notice requirements were held permissible but giving buyers a few days additional notice was found to be unfair even though there was no proof that the extra days made any competitive difference. Indeed, with or without the additional days' notice the initiator of a price increase was not precluded from withdrawing or modifying it within the 30-day period or from extending the 30-day notice period itself.[9] Thus the FTC's rulings and order appear to represent uncertain guesswork rather than workable rules of law.

In our view, before business conduct in an oligopolistic industry may be labelled "unfair" within the meaning of § 5 a minimum standard demands that, absent a tacit agreement, at least some indicia of oppressiveness must exist such as (1) evidence of anticompetitive intent or purpose on the part of the producer charged, or (2) the absence of an independent legitimate business reason for its conduct.[10] If, for

---

9. Even with the use of the additional advance notice, including the extra day's grace period, Du Pont found that initiating price increases was "fraught with uncertainty." In 1977 and 1978 when Du Pont announced several price increases, Ethyl did not immediately follow but announced a smaller increase, which it used to get additional business. Du Pont was then forced to modify its increase to Ethyl's lower level.

10. The requirement is comparable to the principle that there must be a "plus factor" before conscious parallelism may be found to be conspiratorial in violation of the Sherman Act. *See, e.g., Naumkeag Theatres Co. v. New England Theatres, Inc.*, 345 F.2d 910, 911–12 (1st Cir.), *cert. denied,* 382 U.S. 906, 86 S.Ct. 241, 15 L.Ed.2d 158 (1965) (parallel clearances and run schedules by motion picture distributors); *Modern Home Inst. Inc. v. Hartford Accident & Indemn. Co.*, 513 F.2d 102 (2d Cir.1975) (defendant insurers had independent reasons for refusing to buy plaintiff's list of customers). The "plus factor" may be conduct that is contrary to

instance, a seller's conduct, even absent identical behavior on the part of its competitors, is contrary to its independent self-interest, that circumstance would indicate that the business practice is "unfair" within the meaning of § 5. In short, in the absence of proof of a violation of the antitrust laws or evidence of collusive, coercive, predatory, or exclusionary conduct, business practices are not "unfair" in violation of § 5 unless those practices either have an anticompetitive purpose or cannot be supported by an independent legitimate reason. To suggest, as does the Commission in its opinion, that the defendant can escape violating § 5 only by showing that there are "countervailing procompetitive justifications" for the challenged business practices goes too far.

■ In the present case the FTC concedes that the petitioners did not engage in the challenged practices by agreement or collusively. Each acted independently and unilaterally. There is no evidence of coercive or predatory conduct. If the petitioners nevertheless were unable to come forward with some independent legitimate reason for their adoption of these practices, the Commission's argument that they must be barred as "unfair" when they have the effect of facilitating conscious price parallelism and interdependence might have some merit. But the evidence is overwhelming and undisputed, as the ALJ found, that each petitioner independently adopted its practices for legitimate business reasons which we have described (see pp. 134–135, *supra*).

The tenuousness of the Commission's finding that the challenged practices are

"unfair" is illustrated by the fact that it does not tell us when the practices became unlawful: at the time of their original adoption by Ethyl when it was the sole manufacturer of antiknock compounds, when Du Pont entered the market in 1948, when PPG entered in 1961, when Nalco appeared on the scene in 1964, or at some other time. The matter is of some importance for the reason that during the period from 1948 (when Du Pont entered) to 1974 Ethyl's share of the market fell from 100% to 33%. Du Pont's share likewise fell from 50% in 1961, the time of PPG's entry, to 38% in 1974. In the meantime PPG and Nalco, using aggressive competitive measures, captured substantial shares of the market. If the challenged business practices engaged in by the four producers were "unfair" during the 1974–1979 period one would expect that they would be viewed as unfair during the 1960s. Yet the evidence is clear beyond doubt that they did not "facilitate" conscious price parallelism during that earlier period; indeed, from 1960 to 1974 the price of one ingredient of antiknock compounds, TEL (tetraethyl lead) increased only 17% while the price of the other, TML (tetramethyl lead) fell 10%, even though the overall price index rose 57% during the same period.[11] This casts doubt upon the FTC's selection of the 1974–1979 period as indicative of the effect of the business practices at issue. It is difficult to believe that a practice deemed lawful when competitive forces were producing changes in the market became "unfair" when market conditions stabilized.

The Commission contends that although the business practices at issue here might

the defendants' independent self-interest, *Morton Salt Co. v. United States,* 235 F.2d 573, 578–79 (10th Cir.1956), the presence or absence of a strong motive on a defendants' part to enter an alleged conspiracy, *First National Bank of Arizona v. Cities Service Co.,* 391 U.S. 253, 286–88, 88 S.Ct. 1575, 1591–1592, 20 L.Ed.2d 569 (1968); *Interstate Circuit, Inc. v. United States,* 306 U.S. 208, 222–23, 59 S.Ct. 467, 472–473, 83 L.Ed. 610 (1939), or the artificial standardization of products, *C-O-Two Fire Equip. Co. v. United States,* 197 F.2d 489, 493 (9th Cir.), *cert. denied,* 344 U.S. 892, 73 S.Ct. 211, 97 L.Ed. 690 (1952). In *United States v. General Electric Co.,*

*et al.,* 565 F.2d 208 [1977–2] Trade Cas. ¶ 61,659, at 72,715 (E.D.Pa.1977), for instance, General Electric in addition to announcing that it would adhere to its published prices and grant no discounts, adopted a "price-protection" policy under which, if it offered a discount to a customer, it obligated itself to give the same discount retroactively to all other customers who had bought the product within the previous six months, thus voluntarily penalizing itself for price-discounting.

**11.** Economic Report of the President 227 (1983).

not be unfair under other market conditions, they assume that unlawful character when adopted in a concentrated or oligopolistic market in which a few producers sell a homogenous product, demand is inelastic, prices are "supracompetitive," and barriers to entry are high. It is argued that in such a milieu the practices assist the producers in independently maintaining prices at higher levels than would otherwise be the case. Perhaps this argument would be acceptable if the market were clearly as so described and a causal connection could be shown between the practices and the level of prices. Indeed the Commission majority concedes that "facilitating practices will be found to violate § 5 as unfair methods of competition only if the weight of the evidence shows that competition has been substantially lessened" and that it was required to "establish a *clear nexus* between the challenged conduct and adverse competitive effects before invoking our authority in this regard." But the record does not contain substantial evidence supporting many of the Commission's conclusions or showing a causal connection between the challenged practices and market prices. Indeed, it appears to be riddled with deficiencies and inconsistencies, many of which are noted by Chairman Miller in his dissent.

In the first place, price uniformity and parallelism was much more limited than the FTC would have it. During the relevant period (1974–1979) Nalco extended price discounts on more than 80% of its sales and PPG on more than one-third of its sales, the latter increasing to 58% of its sales in 1979 as the sellers competed for fewer buyers in a diminishing market. Although there was for the most part price parallelism on the part of Du Pont and Ethyl, they effectively met the price discounts of the other two producers by providing competition in the form of extensive services which had the effect of retaining old customers or luring away new ones. Thus the total package, including free valuable services and discounts, presents a picture of a competitive market in which large, sophisticated and aggressive buyers were making demands and were satisfied with the results. To the extent that there was price uniformity, that condition is as consistent with competitive as with anticompetitive behavior.[12]

The problems faced by anyone thinking of entering the market were not "barriers" in the usual sense used by economists, such as requirements for high capital investment or advanced technological know-how. The main problem has been that market demand, due to factors uncontrolled by petitioners, is sharply declining. A dying market, which will soon dry up altogether, does not attract new entries. Absent some reasonable prospect that a price reduction would increase demand—and there is none—it is not surprising that existing producers have not engaged in as much price competition as might exist under other conditions. To suggest that industry-wide use of delivered instead of f.o.b. pricing restrained price competition in such a market ignores the de minimis part freight charges played in the price paid by customers. It also overlooks the fact that f.o.b. pricing is not necessarily more competitive than delivered pricing.

■ In short, we do not find substantial evidence in this record as a whole that the challenged practices significantly lessened competition in the antiknock industry or that the elimination of those practices would improve competition. The Commission's expert, Dr. George Hay, stated mere-

12. The Commission conceded that, absent advance notice to customers of price increases, the prices would in any event have tended toward uniformity except for special hidden discounts, stating:

"While there is a degree of uncertainty in determining pricing responses even with advance notice, the theory of the complaint was not that *all* uncertainty was removed, only that the environment was changed enough to have a substantial effect in promoting anticompetitive price coordination. While prices would likely have tended toward uniformity (except for special hidden discounts) without advance notice, the process of reaching uniformity without advance notice would have been fraught with a much higher degree of risk for the initiator of a price increase." (Emphasis in original).

ly that "the market would have operated differently absent these practices"; he could not estimate the extent of that difference. All four of the petitioners' experts, however, who had impressive credentials and experience, stated conclusively that the lack of perfect competition in the antiknock industry was due to the structure of the industry and that the challenged practices had little if any effect on competition. The Commission contends that the practices reduced uncertainty about prices in the industry; the petitioners' experts convincingly argued, on the other hand, that regardless of the practices, competitors learned of each other's prices anyway within hours and that most of the significant competition within the industry occurred on nonprice terms. Thus, even if the Commission has authority under § 5 to forbid legitimate, non-collusive business practices which substantially lessen competition, there has not been a sufficient showing of lessening of competition in the instant case to permit the exercise of that power. *Boise Cascade Corp. v. FTC*, 637 F.2d 573, 581 (9th Cir.1980).

The Federal Trade Commission's order is vacated.

LUMBARD, Circuit Judge, concurring and dissenting:

In propounding a more flexible standard for § 5 violations, the FTC has imposed on itself the heightened requirement of showing that challenged practices have had a substantial adverse effect on competition. As I agree with Judge Mansfield that the record does not support the FTC's finding of substantial effect here, I concur in denying enforcement of the FTC's proposed order.

As this failure alone requires us to deny enforcement, it is unnecessary for us to reach the broader question raised by the FTC's order: whether, as my colleagues hold, the FTC's authority under § 5 is limited to conduct that is either *per se* pernicious (i.e., collusive, coercive, predatory or exclusionary) or could not have been adopted for other than pernicious reasons; or whether, as the FTC now argues, it extends also to conduct that may be acceptable in some situations but not in others, in light of poor industry structure and performance, substantial anticompetitive effects, and lack of offsetting procompetitive justification. I would prefer to leave that question to another day, when the FTC has developed a record that more strongly supports the power it now seeks, and has better defined the standards for its exercise.

As Judge Mansfield acknowledges, Congress intended § 5 to give to the FTC broad and flexible powers to attack anticompetitive conduct, *see FTC v. Sperry & Hutchinson Co.*, 405 U.S. 233, 239–42, 92 S.Ct. 898, 903–904, 31 L.Ed.2d 170 (1972); *FTC v. Keppel & Bro., Inc.*, 291 U.S. 304, 310–12, 54 S.Ct. 423, 425, 78 L.Ed. 814 (1934), and over the years the courts have shown great deference to the FTC's own view of the extent of those powers. *See, e.g., FTC v. Brown Shoe Co.*, 384 U.S. 316, 320–22, 86 S.Ct. 1501, 1503, 16 L.Ed.2d 587 (1966); *FTC v. Motion Picture Advertising Service Co.*, 344 U.S. 392, 396, 73 S.Ct. 361, 364, 97 L.Ed. 426 (1953). I see no justification for showing less deference here, unless we are convinced that the power the FTC now seeks exceeds the scope of § 5, or is so unavoidably vague as to preclude any meaningful standards for its exercise. As I am at present convinced of neither, I cannot join in this part of the court's opinion.

On the scope of § 5, Judge Mansfield does not appear to argue that § 5 by its terms cannot be construed to extend to noncollusive practices that facilitate oligopolistic pricing. Nor do I think that such an argument has much weight, given the deliberate vagueness of the statutory language, and the generous reach of the Supreme Court's limiting gloss that § 5 is intended to reach only that conduct which is contrary to the spirit of the Sherman and Clayton Acts. *See, e.g., FTC v. Brown Shoe Co., supra*, 384 U.S. at 321–22, 86 S.Ct. at 1502–1503; *Fashion Originators' Guild v. FTC*, 312 U.S. 457, 463, 61 S.Ct.

703, 706, 85 L.Ed. 949 (1941). Indeed, that limitation is particularly unlikely to prove troublesome for the FTC here, as there is substantial support for the view that the noncollusive adoption of "facilitating practices" like uniform delivered pricing systems is contrary not only to the spirit of Sherman Act § 1, but to its letter as well.[1]

On the problem of vagueness in the FTC's proposed prohibition of noncollusive "facilitating practices," I share Judge Mansfield's concern that it will be difficult to devise standards that are certain enough to allow companies to predict government intervention, and narrow enough not to encompass clearly desirable conduct. However, that difficulty inheres to some degree in all balancing tests, including those decisions the FTC and the courts must routinely make in applying the Rule of Reason under Sherman Act § 1, or an analogous reasonableness standard under Sherman Act § 2 and Clayton Act § 7.[2] If we are to preclude categorically the use of such a flexible approach under FTC § 5, I think it is incumbent on us to explain why that difficulty is peculiarly and necessarily fatal here but not elsewhere. I would prefer not to hazard that explanation on the basis of this one failed attempt by the FTC to articulate and apply workable standards.

Furthermore, I think it is worth noting that FTC power in this area is already broad and its scope ill-defined, due in part to the expansive list of so-called "plus factors" devised by the courts for inferring an agreement,[3] and in part to that accommodating word, "tacit," which has created a hole in the agreement requirement large enough at times to swallow it entirely. *See Interstate Circuit v. United States,* 306 U.S. 208, 227, 59 S.Ct. 467, 474, 83 L.Ed. 610 (1939); *Ambook Enterprises v. Time, Inc.,* 612 F.2d 604, 613–18 (2d Cir.1979); *Bogosian v. Gulf Oil Corp.,* 561 F.2d 434, 444–47 (3d Cir.1977), *cert. denied,* 434 U.S. 1086, 98 S.Ct. 1280, 55 L.Ed.2d 791 (1978); *see also United States v. Paramount Pictures, Inc.,* 334 U.S. 131, 142, 68 S.Ct. 915, 921, 92 L.Ed. 1260 (1948). Indeed, it proved large enough in *Boise Cascade Corp. v. FTC,* 637 F.2d 573 (9th Cir.1980), to allow the Ninth Circuit to reach in substance, even if not in words, precisely the result the FTC seeks here, by holding there must be at least a tacit agreement to use "facilitating practices," but that such an agreement could be shown, *inter alia,* by substantial adverse economic effects. *Id.* at 576–77. Given the liberal judicial construction of the agreement requirement in the past, I have some doubt whether dispensing with the requirement entirely to reach "facilitating practices" under § 5 would substantially broaden the FTC's enforcement power, or make its scope any more vague than under present law.[4]

---

1. *See* D. Turner, "The Definition of Agreement Under the Sherman Act: Conscious Parallelism and Refusals to Deal," 75 Harv.L.Rev. 655, 657–84 (1962); P. Areeda and D. Turner, 3 *Antitrust Law* at 362 (1978); R. Posner, *Antitrust Law: An Economic Perspective* at 70–71 (1976); R. Posner, *Antitrust: Cases, Economic Notes & Other Materials* at 128–29, 135–36 (1974); *Cf.* L. Sullivan, *Antitrust Law* at 357 (1977).

2. *See, e.g., Continental T.V., Inc. v. GTE Sylvania, Inc.,* 433 U.S. 36, 97 S.Ct. 2549, 53 L.Ed.2d 568 (1977), *on remand,* 461 F.Supp. 1046, 1052 (N.D.Cal.1978); *United States v. General Dynamics Corporation,* 415 U.S. 486, 494–510, 94 S.Ct. 1186, 1192–1200, 39 L.Ed.2d 530 (1974); *Brown Shoe Co. v. United States,* 370 U.S. 294, 321–346, 82 S.Ct. 1502, 1521–1535, 8 L.Ed.2d 510 (1962); *United States v. DuPont Co.,* 351 U.S. 377, 386–404, 76 S.Ct. 994, 1002–1012, 100 L.Ed. 1264 (1956); *United States v. Columbia Steel Co.,* 334 U.S. 495, 527–31, 68 S.Ct. 1107, 1124–1126, 92 L.Ed. 1533 (1948); *Maple Flooring Ass'n v. United States,* 268 U.S. 563, 579–86, 45 S.Ct. 578, 583–586, 69 L.Ed. 1093 (1925); *Harold Friedman, Inc. v. Thorofare Markets, Inc.,* 587 F.2d 127, 141–44 (3d Cir.1978); *Eiberger v. Sony Corp. of America,* 459 F.Supp. 1276, 1282–84 (S.D.N.Y.1978), *aff'd* 622 F.2d 1068, 1075–81 (2d Cir.1980).

3. *See, e.g.,* cases cited at n. 9, *supra.*

4. My doubts are increased by the fact that even those courts that have required the FTC to show an agreement to adopt practices such as basing point pricing before they would find an antitrust violation have not necessarily limited remedial decrees to enjoining future *agreements* to adopt such schemes, but have on occasion enjoined their use as well. *See, e.g., FTC. v. National Lead Co.,* 352 U.S. 419, 77 S.Ct. 502, 1 L.Ed.2d 438 (1957). *Cf. United States v. General Electric Co.,* 565 F.2d 208, 1977–2 Trade Cas.

I would therefore vacate the FTC's order, but leave open the question whether, with more clearly delineated standards and on a more compelling set of facts, the FTC could use § 5 to reach noncollusive "facilitating practices" shown to have a substantial anticompetitive effect, without any procompetitive justification.

¶ 61,660 (E.D.Pa.) (modified consent decree prohibits individual public dissemination of price information and individual use of retroactive "most favored nation" clauses).

Furthermore, I note that insofar as the FTC's Rule of Reason approach to noncollusive "facilitating practices" may remain necessarily vague, § 5 may be particularly well suited as a remedial tool, as it provides only for prospective equitable relief, not for criminal penalties or treble damages. *See* P. Areeda and D. Turner, 2 *Antitrust Law* at 22–23 (1978).