**FEDERAL TRADE COMMISSION,**
**Plaintiff,**

v.

**ABBOTT LABORATORIES, Defendant.**

Civ. A. No. 92–1364.

United States District Court,
District of Columbia.

May 27, 1994.

Richard Brian Dagen, F.T.C., David Charles Shonka, John Edward Scribner, F.T.C., Office of Gen. Counsel, Michael E. Antalics, Patricia Schultheiss, F.T.C., Bureau of Competition, Thomas Andrew Gottschalk, Karen Natalie Walker, Kirkland & Ellis, Washington, DC, for Abbott Laboratories.

Paul C. Saunders, Cravath, Swaine & Moore, New York City, for Bristol–Myers Squibb Co.

### MEMORANDUM OPINION AND FINAL JUDGMENT

SPORKIN, District Judge.

This is an action by the Federal Trade Commission ("FTC") alleging that Abbott Laboratories violated Section 5 of the FTC Act, 15 U.S.C. § 45(a), in connection with

bids submitted by Abbott to the Puerto Rican government to supply infant formula under the federally funded Special Supplemental Food Program for Women, Infants and Children ("WIC") in Puerto Rico. The alleged unfair trade practice occurred in June of 1990. The Court held a bench trial which commenced on February 7, 1994 and lasted more than three weeks. The Court heard live testimony from eight fact witnesses and four experts, parts of nineteen depositions and hundreds of exhibits were also introduced into evidence.

## Findings of Fact

### Statement of the Case

Plaintiff, the Federal Trade Commission ("FTC"), seeks a permanent injunction and restitution or disgorgement under Section 13(b) of the Federal Trade Commission Act, 15 U.S.C. § 53(b). The Commission's complaint charges the defendant, Abbott Laboratories ("Abbott") with engaging in unfair methods of competition in or affecting commerce in violation of Section 5(a) of the FTC Act, 15 U.S.C. § 45(a). This charge stems from Abbott's role in the submission of bids to provide infant formula under the Commonwealth of Puerto Rico's WIC program.

The WIC program is a federal program administered by the Food and Nutrition Service ("FNS") of the Department of Agriculture ("USDA"). The WIC program is designed to provide supplemental foods (including infant formula) and nutrition education to women, infants and children (up to their fifth birthday) who have income levels so low as to put them at nutritional risk. 42 U.S.C. §§ 1786–1788 (1988). WIC is funded by the federal government, but the implementation of the program is left to the states. Puerto Rico is treated like a state for WIC purposes and it administers its own WIC program through the Puerto Rico Department of Health and its procurement division, known as AFASS[1].

The FTC complaint alleges that Abbott, the largest producer of infant formula in the United States, conspired "to fix, stabilize, or otherwise manipulate" the bids to supply infant formula to the Puerto Rican WIC program. Complaint ¶ 12. The complaint also alleges that Abbott "with anticompetitive intent or without an independent legitimate business reason, provided information that showed to competing bidders that defendant preferred, and would bid in a manner to support, an open market instead of a sole source system [of infant formula procurement for the WIC program] in Puerto Rico." Complaint ¶ 13. Thus the complaint makes two separate allegations. The first is that Abbott conspired with others to "rig" the bids to supply formula under Puerto Rico's WIC program. The second allegation is that Abbott acted unilaterally (without necessarily agreeing with others) to obtain an anticompetitive outcome in the bid.

### Infant Formula and the WIC Program

In 1990, Abbott, through its infant formula division Ross Laboratories accounted for more than 50% of U.S. infant formula sales. Between 1982 and 1990, Abbott and its two principal competitors, Mead Johnson & Company ("Mead"), and Wyeth Laboratories ("Wyeth") accounted for over 90% of domestic infant formula sales. The infant formulas produced by Abbott, Mead, and Wyeth are substantially similar in nutritional quality. Despite this similarity, new mothers generally continue to purchase and feed their babies the same brand of formula that was supplied to the baby in the hospital.

In Puerto Rico, the WIC program provides infant formula to approximately two-thirds of the infant population. This compares to a national average of about one-third. Puerto Rico is one of the nation's most important WIC markets. Puerto Rican WIC participants receive their infant formula through retail channels. Wholesalers buy formula from the manufacturers for resale to retailers or other distributors. The retailer sells infant formula off the shelf to WIC program recipients who pay for the formula with coupons or vouchers received from the local WIC agency. The retailer then sends the

---

1. Administración de Facilidades y Servicios de Salud (Health Facilities and Services Administration).

coupons to the state WIC agency for payment.

The bids submitted for the WIC infant formula contract are in the form of rebates (per can of formula) to the state. The rebates obtained by the WIC programs from the infant formula manufacturers are used by the state WIC program to fund purchases of infant formula and other food products for additional needy persons. The saving from these "cost containment" measures is crucial because funding for WIC does not fully cover the cost of the program.

Nationally, only slightly more than 60 percent of the eligible population participates in WIC. In simple terms, there is not enough federal money to feed all the mothers and children who meet the qualifying criteria. By implementing cost containment measures, state WIC agencies have been able to use the saved money to serve a larger percentage of the eligible population than would have otherwise been possible. Approximately 23% of the 6.5 million people who receive food under the WIC program nationally, receive it because of funds that have been made available through manufacturers' rebates.

There are two different kinds of cost containment systems that have been implemented by states in trying to reduce the cost of the WIC program. One cost containment system is the "open market system." In an open market system, all suppliers are eligible to participate in the WIC market whether or not they offer a rebate. They compete for consumer patronage much as they do in the private sector of the market.

The other cost containment program is referred to as the "sole source system."[2] Under a sole source system, a state's WIC program selects the supplier after soliciting sealed bids from all eligible and interested manufacturers.[3] The manufacturer offering the lowest net cost per unit (or highest rebate per unit) of infant formula is awarded the sole source contract for the entire state. Under the sole source system, only the winning bidder is permitted to supply infant formula to the state's WIC mothers. Federal regulations create a strong preference for a sole source system and companies wishing to participate are required to submit sealed competitive bids.

Under the sole source system, the manufacturer is given a monopoly in that particular state. The possibility of obtaining an exclusive business arrangement means that formula manufacturers generally offer higher rebates under a sole source procurement than under the open market non-exclusive system. Conversely, under the open market system, manufacturers pay smaller rebates because they are not guaranteed a WIC monopoly. The smaller rebate paid under the open market system means that manufacturers may make more money under the open market system than under a sole source procurement. Although market share is maximized under the sole source, profits may be reduced because of the larger rebate payment.[4]

A state may implement an open market system without USDA approval only where the savings that would accrue to the WIC program through open market rebates are equal to, or greater than, the savings under the highest sole source bid. 7 C.F.R. § 246.-16(m). If the savings to the state under the open market option are less than the savings from the sole source option, the state WIC agency must obtain a waiver from the USDA to implement an open market system.[5] Such waivers are granted only in very limited circumstances where the difference in savings between the two systems is marginal. Once

2. This is also sometimes referred to as a "closed market" system.

3. The sole source system is described in 7 C.F.R. § 246.16(m)(1).

4. For example, prior to the 1990 Puerto Rico WIC bid, Abbott projected profits of $2.8 million each year under the sole source contract at the $1.106 rebate level (Defendant's Exhibit 104 (Tab. J, p. 4)). By contrast, Abbott projected substantially higher profits of $5.4 million each year if an open market contract were awarded at a rebate of 43 cents (Defendant's Exhibit 104 (Tab. C, p. 4)).

5. States may prefer "open market" to "sole source" for a number of reasons, including the increased choice for the consumer and the possibility of disruption of supply in the event of a strike or natural disaster.

the WIC bidding is complete, the state WIC agency must submit a bid analysis for USDA review and approval.

*Infant Formula and the Hospital System in Puerto Rico*

In addition to administering the Puerto Rico WIC program, AFASS, the Puerto Rican Department of Health's procurement division, maintains and operates eight public hospitals throughout Puerto Rico. Approximately 23,000 "WIC babies" are born in these hospitals each year. Another 20,000 "WIC babies" are born in non-AFASS government hospitals and private hospitals in Puerto Rico. Abbott, Mead, and Wyeth are the principal suppliers of infant formula to these hospitals, AFASS and non-AFASS alike. Prior to 1990 each of these three companies made cash payments to the government hospitals and supplied free formula to them for in-hospital feeding and for distribution, in "take home packs" to new mothers. Since it is known that mothers prefer feeding their children the brand of formula they received at the hospital, these payments are a key part of the manufacturers' marketing plans to increase market share in the Puerto Rican infant formula market generally and the WIC market in particular.

There was testimony at trial that the Puerto Rican state hospital system was experiencing financial difficulties in 1990. The payments by formula makers were important to the Puerto Rican hospital system as they generated on the order of two million dollars annually in discretionary income for the government hospitals. These extra payments were not subject to the control of the USDA and the monies generated by these payments were not allocated to the WIC program.

So, there are two different infant formula supply systems interacting in this case. The first is the AFASS hospital supply system in which formula is provided free of charge to AFASS hospitals, along with payments of money and equipment. The second is the WIC rebate program. These systems interact in that both are administered by the Puerto Rican government. The hospital supply system is used by the manufacturers to increase their market share of the wider infant formula market, including the market for WIC babies.

Tension arises from the fact that under a sole source WIC supply system, the marketing benefits that accrue to hospital program formula suppliers are undermined. Under the sole source system, upon discharge from the hospital, all WIC infants born in AFASS hospitals would have access only to the formula supplied by the sole source supplier. Money spent by the manufacturers to promote their brand of formula in the hospital would be wasted under a sole source system, because WIC mothers would be limited to the "sole source" brand of formula on leaving the hospital.

During the 1990 WIC bid, it was understood by all the formula manufacturers that payments to the AFASS government hospitals would continue only under an open market WIC rebate system. Partly because the Puerto Rican hospital system would lose the substantial side payments from manufacturers which the hospitals used to buy equipment and other supplies, AFASS wanted an open market WIC rebate system in Puerto Rico. This was particularly so since any unspent Puerto Rican WIC funds would be reallocated from Puerto Rico to other WIC programs. Money paid to the Puerto Rico hospitals directly was more likely to stay in Puerto Rico than excess WIC rebate funds. Abbott and the other formula providers knew of Puerto Rico's preference for an open market system.

There are no allegations of corruption against any of the participants in this case, either among the formula manufacturers or the Puerto Rican government officials. It is clear that there was a competitive tension between the federally funded WIC program and the legitimate interests of the Puerto Rican health officials. It was obvious to all involved that the formula manufacturers, in their eagerness to boost market share and increase profits, would be willing to make price concessions, both by increasing their WIC rebate bids and, if necessary, by making direct payments to the AFASS hospitals. The willingness to make such concessions existed only if the manufacturers would be permitted to participate in an open market

WIC procurement system. Under the sole source system, any price concessions would be provided by the sole source winner and be absorbed by the WIC program. This lawsuit results from the tortured and somewhat suspect 1990 bidding process that ultimately resulted in an open market system.

*The Pre–Bid Process*

Prior to June 1990, each of the AFASS hospitals contracted separately with an infant formula company to select it as the supplier of formula for use by babies staying in that hospital. In the spring of 1990, the director of AFASS decided to centralize these hospital formula supply arrangements by adopting what is referred to as the hospital rotation system. Under this supply system, the nine AFASS hospitals were divided into three groups. Each company was offered the opportunity to supply free formula to one hospital group and to rotate as the supplier to the other two groups in each of the two succeeding years, provided the company accepted the terms and conditions of the AFASS hospital supply contract. To participate in the rotation system, the companies had to agree to pay $50 per baby to AFASS and to rebate at least 40 cents to the WIC program. This 40 cent minimum was premised on the adoption of an open market system. The request for proposals for the rotation system was announced on June 6, 1990.

Just prior to the public announcement of the "rotation system," AFASS had released the solicitation for bids to supply infant formula under Puerto Rico's WIC program. The bidding was to be conducted under the so-called "Florida model" of bidding. Under the Florida model, the companies could submit bids for either the sole source option, the open market option, or both. Again, AFASS officials recognized that if a sole source contract resulted from the WIC bid, the $50 per infant payments to AFASS would end because neither the winning nor the losing bidders would have any incentive to continue such payments. A pre-bid conference for June 7, 1990 was scheduled.

On June 5, 1990, Puerto Rico officials held a meeting to discuss its proposed "rotation system" to supply infant formula to its hospitals. Abbott representatives who attended the meeting walked out of the meeting when the discussion by Mead and Wyeth turned to the minimum 40 cent rebate specified in the proposed hospital supply contract. The Abbott officials deemed it inappropriate to discuss prices or market allocations in the presence of competitors. This action on the part of Abbott shows that Abbott officials were sensitive to appropriate legal requirements.

On June 7, 1990, AFASS held its scheduled pre-bid conference on the proposed WIC contract. During the conference, the possibility of Puerto Rico's obtaining a waiver of the sole source requirement from the Department of Agriculture was briefly discussed. All company representatives were of the view that the sole source system would not be in the best interests of Puerto Rico. The comments centered around the "unique" nature of Puerto Rico, namely, its isolation from the mainland which made it vulnerable to a cutoff in supply. The Wyeth representative cryptically wrote in his notes, "Rebate, they are all in agreement. Everyone asked for an open market." After the WIC pre-bid conference was concluded, AFASS notified all bidders that the opening of bids would be postponed until June 14, 1990 in order to give AFASS time to respond to questions raised at the conference.

*The First WIC Bid and Post–Bid "Action"*

On June 14, 1990, the sealed WIC bids of Abbott, Mead, and Wyeth were opened and announced by Mr. Colon, the AFASS official in charge of the bid. Mead and Wyeth submitted identical bids of 40 cent rebates for both the sole source and open market options. Abbott submitted a 43 cent open market bid and a bid of $1.106 for the sole source option. On the basis of these bids, Abbott was the apparent winner of the WIC contract on a sole source basis.

It is conceded by the FTC that Abbott's bid was in every respect proper and lawful. Abbott's bid was based on its objective analysis of what it would take to outbid its competitors. The odd 6 tenths of a cent was tacked on its bid to meet Wyeth's habit of making bids in $0.005 increments.

Abbott was surprised by its competitors' low 40 cent sole source bids. Mr. Thomas

Hodgson, who at the time held the post of President of Abbott International[6], although pleased at having won the sole source contract, was somewhat dismayed with having bid so much higher than Abbott's competitors. From the record, Wyeth and Mead's identical noncompetitive bids strongly suggest the two companies were in communication with each other but not with Abbott.

AFASS officials were displeased with the results of the bid. They were unhappy that Abbott had submitted a "competitive" sole source bid. Right after the bids were opened, disheartened Puerto Rican officials began to look for ways to reverse the results.

On Friday morning, June 15, 1990, Mr. Colon of AFASS called Abbott's Mauricio Hernandez who was stationed in Puerto Rico. Colon asked Hernandez whether Abbott was willing to withdraw its sole source bid. Hernandez passed along this information to Hodgson and other Abbott officials in Illinois. Abbott officials sought the advice of one of its in-house attorneys, Honey Lynn Goldberg. She advised Messrs. Hodgson and Hernandez that Abbott could not legally withdraw its bid.

Based upon Ms. Goldberg's advice, Hernandez told Colon that Abbott could not and would not withdraw its bid. Colon asked Hernandez whether Abbott would sue AFASS if AFASS cancelled the bid. Hernandez again called Hodgson to relay Mr. Colon's question. Hodgson responded that it was not Abbott's policy to sue its customers or the government. Hernandez passed along this response to Colon. Hernandez also told Colon that any legal basis for cancelling needed to be communicated in writing to Abbott.

On Monday morning, June 18, Colon called Abbott's Hernandez and told him that AFASS's failure to include a performance bond in its invitation to bid on the procurement made Abbott's bid cancellable. Colon again sought assurance that Abbott would not sue. Hernandez relayed this information to Hodgson, who insisted that the basis for the cancellation be put in writing. Hodgson also repeated that it is not Abbott's policy to sue governments. This response by Hodgson, which was intended as non-committal, was conveyed by Hernandez to Colon who took it as an acceptance of AFASS' decision to invalidate the first bid.

It is clear that Abbott was skeptical about whether the performance bond was a legitimate basis for cancelling the award. Abbott's lawyer, Goldberg, advised Hodgson that the performance bond was not a valid basis for cancelling the results of the first bid. Others within Abbott thought Abbott should defend its first round win in court. Nevertheless, Abbott did not initiate a lawsuit to contest AFASS's cancellation of its bid. It is Abbott's position that it neither encouraged nor discouraged the Puerto Rican government's cancellation of their successful bid. As Hodgson testified, "We didn't want to take a position on it. It was their call. . . . If they wanted to cancel it, that was their prerogative to cancel."[7]

Abbott's doubts about the legal basis asserted by Puerto Rico for cancellation were shared by USDA officials. Nevertheless, those officials were sufficiently uncertain about the scope of Puerto Rico's legal authority to cancel the bid that they refrained from challenging the cancellation at the time and made no attempt to stop the second round of bidding.

USDA official Vogel explained at trial the reasons why the USDA was reluctant to step in and act. If the USDA had suspected that the bid was being "rigged" in violation of federal law by the Puerto Rican officials, the Department was entitled to cut off all WIC funds to Puerto Rico. It was thought that such an move would be an overreaction in that it would harm WIC recipients—poor women and children. USDA officials thought that such an approach would place the USDA in an unfavorable light. As Vogel testified:

> What we didn't want to do is in the pursuit of our concerns with the procurement, be in a position where, from an outsider's point of view, you'd think it was two gov-

---

6. Hodgson is presently President and Chief Operating Officer of Abbott Laboratories.

7. Hodgson, Record at 1707.

ernment agencies squabbling about procurement laws, at the expense of food benefits to needy Puerto Ricans.[8]

The USDA did have other administrative options available. The Department could have withheld administrative funds for enforcement purposes. These administrative funds are made available out of WIC grants to pay for the salaries of state WIC administrators. For whatever reason, the USDA, like Abbott, did not challenge Puerto Rico's cancellation of the Abbott bid even though both parties knew the cancellation clearly was vulnerable to legal attack.

*The Second Round of Bidding*

After cancelling Abbott's bid, AFASS set up a second round of bids under the Florida system. In deciding what to do on the second round, Abbott considered a number of different options. Initially, Hernandez recommended that Abbott bid zero on the sole source option because it was obvious AFASS "did not want a closed system."[9] By contrast, Abbott's lawyer Goldberg recommended Abbott "no bid" the sole source option. In this way, she believed that Abbott might better preserve its ability to contest the cancellation in the event that Mead or Wyeth bid competitively on the sole source option.

At trial, Hodgson explained that Abbott was put in a precarious position in formulating a second round bid. A competitive bid, in Hodgson's view, was pointless. AFASS had made it clear that AFASS would do everything in its power to bring about an open system. In addition, Abbott's first round competitive bid of $1.106 was not a viable option on the second round because Abbott had revealed to its competitors its bidding strategy. By bidding more than $1.106, Abbott would have been bidding against itself. Bidding at all in the second round would have been an acknowledgement that Abbott acquiesced in the cancellation of its first round win. Hodgson and Goldberg

testified that Abbott was happy with its initial sole source victory, although Abbott did prefer the open market system.

The one option that Abbott could not and would not accept was Mead or Wyeth winning a sole source bid after the second round, thereby eliminating Abbott from Puerto Rico's WIC market. So the second round "no bid" for the sole source option was Abbott's best attempt to remain a viable player in the Puerto Rican baby food market.

Mead and Wyeth submitted the same identical bids in the second round as they had in the first: 40 cent sole source, and 40 cent open market. Abbot submitted a 43 cent open market bid, as it had in the first round, and a "no bid" on the sole source option.

When the second round bids were opened, Mr. Colon of AFASS congratulated the participants and "told everyone he was happy that an open system was going to prevail and thanked everyone for putting an open system in place in Puerto Rico."[10] After this second round, because it was clear that the government would receive a larger rebate under the open market system than under the sole source system,[11] AFASS was entitled by law to implement an open market WIC infant supply formula system.

The results of the second bid were sent to USDA for verification. Although USDA was suspicious that the bidding process was improper, USDA verified the bids and did not prevent the implementation of the open market system. Despite USDA's acquiescence in the open market system, they still had "concerns" and referred the matter to the Inspector General for investigation.

The WIC contracts with Puerto Rico were finalized and signed in December 1990. As a result of the second bid, rather than one company being given a monopoly, all three of the major formula producers were able to remain in Puerto Rico and compete against each other.

8. Vogel, Record at 170–71.

9. Plaintiff's Exhibit 55 at 10.

10. Plaintiff's Exhibit 55 at 19.

11. In the second round, the best sole source rebate bid was 40 cents while under the open market, at least Abbott would be paying a 43 cent rebate for its formula. So the total savings under the open market was greater than under sole source.

The federally funded WIC program suffered dramatically. It was deprived of the difference between 40–43 cents and $1.106 on each can of baby formula provided to WIC mothers. As a result, the WIC program lost millions of dollars in rebates, causing the participation of fewer low income people in the WIC program.[12] By contrast, the Puerto Rico hospital system benefited from the open market system by obtaining a $50 payment per baby and free formula and equipment from the formula manufacturers.[13] Mead and Wyeth have settled separate complaints by the government for their actions in the 1990 Puerto Rico WIC bids.[14]

### Decision

The Federal Trade Commission's complaint has two counts, both alleging violations of Section 5 of the FTC Act. The first of the two counts alleges collusion between Abbott, Mead, Wyeth, and the Puerto Rican AFASS officials to bring about the open market system in Puerto Rico:

> Defendant's actions to conspire or to combine with others to fix, stabilize, or otherwise manipulate the Puerto Rico WIC rebate bids in 1990 and to guarantee an open market system rather than a sole source system, constitute unfair methods of competition in or affecting commerce in violation of Section 5 of the FTC Act.

Complaint ¶ 17. The second count alleges that without conspiring with others, Abbott engaged in unfair methods of competition by providing information to its competitors:

> By providing information with anticompetitive intent or without an independent legitimate business reason that showed to competing bidders that defendant preferred, and would bid in a manner to support, an open market instead of a sole source system in Puerto Rico, defendant has engaged

in unfair methods of competition in or affecting commerce in violation of Section 5 of the FTC Act.

Complaint ¶ 19.

### Count I

To prevail on the first count, the FTC must show that Abbott conspired with Mead, Wyeth, or AFASS to cancel Abbott's first successful bid and to rig the second bid. There is no direct evidence that Abbott communicated directly with Mead and Wyeth concerning the events in question. No Mead or Wyeth employee testified that they agreed to make low sole source bids on the second round in exchange for Abbott's promise to "no bid" its sole source option. The FTC acknowledges this weakness in its case, but relies on evidence of communications between Abbott and AFASS, as well as the pattern of bidding to show that the result of an open market after the second round bid could not have occurred without the existence of collusion.

The FTC first points to the contacts subsequent to the first bid opening between AFASS's Colon and Abbott's Hernandez. During these conversations Colon inquired as to Abbott's willingness to withdraw its first round successful bid. And when Abbott rejected this request, the discussion turned to Abbott's acquiescence to Puerto Rico cancelling the bid. The FTC cites Abbott's message to AFASS that it was not Abbott's policy to sue governments and Abbott's agreement to "accept" AFASS' decision to cancel on a somewhat contrived basis.

The FTC also refers to Colon's contacts with Mead and Wyeth officials in which he purportedly conveyed to Abbott's competitors that the first round bid would be canceled, thereby permitting an open market to

---

12. There was evidence at trial that the harm to the government from not receiving the $1.106 rebate totalled more than $21 million.

13. The lost savings to the Federal government were greater than the gain to the Puerto Rican hospitals. This is one reason why the formula

makers were eager to implement the open market—they made money on the difference.

14. The total value of the Mead and Wyeth settlements has been estimated by the Plaintiffs in the range of $7.7 million. Because the settlements involved in-kind payments of formula by Mead

be implemented.[15] The FTC submits that from these contacts between Abbott and AFASS, and between AFASS and Mead and Wyeth, the Court can infer the existence of an agreement not to compete on the second round.

It is the FTC's position that the second round bids of 40 cents by Mead and Wyeth, and "no bid" by Abbott, made no economic sense without the existence of a conspiracy. FTC's economic expert, Dr. Janusz Ordover, who analyzed other Florida model WIC bids, gave his opinion that the 40 cent sole source bids by Wyeth and Mead were noncompetitive.[16] He further testified that Abbott's "no bid" was also noncompetitive since it was not submitted with the intent to win a sole source contract on the second round. Ordover concluded that this strategy by all three formula manufacturers of submitting noncompetitive bids and subjecting themselves to the possibility of being eliminated from the important and profitable Puerto Rico WIC market could only be explained by an agreement or understanding that they would submit noncompetitive bids to assure an open market result.

In reaching this conclusion, Ordover compared what happened in the second round of bidding—no competitive bids by the three manufacturers—with the bids in the first round. In the first round, Abbott was aware of AFASS' preference for an open market system and the fact that Abbott itself would do better economically under such a system. Yet Abbott had submitted a competitive bid of $1.106 out of concern that the sole source would be won by Mead or Wyeth. In the second round, where, according to Ordover, the same economic incentives to bid competitively existed, Abbott declined to submit a competitive bid. Ordover's explanation for

the difference between the two bids was that in the second round, the three formula manufacturers reasonably believed, through their communications with AFASS, that all would submit noncompetitive sole source bids, thereby guaranteeing an open market system and eliminating the possibility that any manufacturer would face the worst case scenario of being shut out of the Puerto Rican WIC market.

Abbott countered Dr. Ordover's testimony with that of Dr. William Wecker, an expert on decision analysis and "game theory" who testified that it was in Abbott's unilateral and independent self interest to submit the "no bid" for the sole source on the second round. Wecker testified that the circumstances surrounding the two bids were substantially different. First, Abbott had won the initial bid round and was in a position to legally contest or "challenge" a second round sole source award to one of its competitors. Second, Abbott had revealed to its competitors what Abbott viewed as its most competitive sole source bid in the first round. So, going into the second round, Mead and Wyeth had knowledge of the range Abbott would most likely bid.

Wecker used an analytical model called a "decision tree" to demonstrate that under two of the options available to the Abbott decision-makers [17], and given the expected returns to Abbott under those options, the submission of a "no bid" was a rational independent choice. Although none of the outcomes were certain, under a wide range of probabilities, the expected value to Abbott of the decision to submit "no bid" was greater than the expected value of a competitive sole source bid in the second round. This result flowed from the fact that Abbott held the

---

and Wyeth, the actual fair-market value of the settlement is disputed.

**15.** There was no evidence presented at trial that Abbott was aware of Colon's contacts with Mead and Wyeth.

**16.** Indeed, two years after Mead's 1990 sole source bid of 40 cents, Mead bid $1.47 for the sole source contract in Puerto Rico. Plaintiff's Exhibit 171. Two years after Wyeth's 1990 sole source bid of 40 cents, Wyeth bid $1.25 for the

sole source contract in Puerto Rico. Plaintiff's Exhibit 209.

**17.** The options included the submission of the "no bid" and the submission of a competitive bid in the range of 1.106. Walker, Record at 2309. Walker used these two options for his model because Dr. Ordover had testified that in a noncollusive world, Abbott would have made a competitive bid in the 1.106 range, as opposed to a "no bid." *Id.*

wild card—the ability to challenge a sole source award to either of its competitors.

In essence, according to Wecker, Abbott found itself in a win-win situation in the second round. Abbott wasn't risking a complete loss—the worst case scenario of a sole source award to Mead or Wyeth—because Abbott had the ability to challenge such an award. And in the event that Mead and Wyeth submitted 40 cent noncompetitive bids, as they had done in the first round, Abbott was assured of the more profitable open market system prevailing.

■ The Court credits Dr. Wecker's refutation of Dr. Ordover's opinion that Abbott could not have made an independent rational decision to submit a "no bid" for the sole source option in the second round. The submission of three noncompetitive second round bids is questionable and certainly raises the possibility of a collusive bidding pattern. But the documents and testimony fail to prove that Abbott was acting in collusion with its competitors. The trial record shows that Abbott International President Hodgson and other Abbott officials were uncertain as to whether Mead and Wyeth were going to repeat their noncompetitive first round bids. Abbott has submitted a plausible explanation for its second round bid strategy and the government has failed to show by a preponderance of the evidence that its action was the result of collusion with its competitors.

Further supporting this conclusion, as even the government acknowledges, is that Abbott's first round bid was above reproach. In addition, Abbott's representatives acted admirably in immediately leaving a pre-bid conference where they believed competitors were improperly discussing price and market allocation issues. The FTC would have the Court find that after behaving properly in two instances where its competitors did not so behave, Abbott changed its corporate mindset, and joined a collusive plan to submit a noncompetitive bid. To the contrary, the Court does not find that Abbott exhibited the "conscious commitment to a common scheme" that is a required element of an illegal conspiracy. *See Monsanto Co. v. Spray–Rite Service Corp.*, 465 U.S. 752, 768, 104 S.Ct. 1464, 1473, 79 L.Ed.2d 775 (1984)

(conspiratorial agreement requires "a conscious commitment to a common scheme"); *Lovett v. General Motors Corp.*, 998 F.2d 575, 579 (8th Cir.1993), *cert. denied*, —— U.S. ——, 114 S.Ct. 1058, 127 L.Ed.2d 378 (1994) (conspiracy requires proof that defendant "had conscious commitment to a common scheme designed to achieve an unlawful objective").

## COUNT II

In the second count of the complaint, the FTC argues for a finding against Abbott on the basis that Abbott engaged in unfair methods of competition by conveying information with an anticompetitive intent to AFASS and through AFASS to Mead and Wyeth. Such an interpretation of § 5 of the FTC Act, the Commission argues, comes within the accepted role of the FTC in policing unfair trade practices. As the Supreme Court has said, the FTC has the authority under the Act to restrict practices which approach, but do not fall within the letter of the antitrust laws:

> Thus, legislative and judicial authority alike convince us that the Federal Trade Commission does not arrogate excessive power to itself if, in measuring a practice against the elusive, but congressionally mandated standard of fairness, it, like a court of equity, considers public values beyond simply those enshrined in the letter or encompassed in the spirit of the antitrust laws.

*FTC v. Sperry & Hutchinson Co.*, 405 U.S. 233, 244, 92 S.Ct. 898, 905, 31 L.Ed.2d 170 (1972) (Footnote omitted).

On this count, the FTC relies on the standard laid down in the case of *E.I. Du Pont De Nemours & Co. v. FTC*, 729 F.2d 128 (2nd Cir.1984) ("*Ethyl*"). In *Ethyl*, the FTC argued that the defendant companies had engaged in non-collusive but nonetheless unfair methods of competition by unilaterally adopting business practices which had noncompetitive effects. The Second Circuit in *Ethyl* spoke at length on both the mandate of the Commission and the scope of the admittedly vague terms, "unfair methods of competition" found in § 5 of the FTC Act. The Second Circuit stated emphatically that some

workable standard must exist for what is or is not to be considered an unfair method of competition under § 5. Otherwise, companies subject to FTC prosecution would be the victims of "uncertain guesswork rather than workable rules of law." *Ethyl,* 729 F.2d at 139. The *Ethyl* Court formulated the following standard:

> In our view, before business conduct in an oligopolistic industry may be labelled "unfair" within the meaning of § 5 a minimum standard demands that, absent a tacit agreement, at least some indicia of oppressiveness must exist such as (1) evidence of anticompetitive intent or purpose on the part of the producer charged, or (2) the absence of an independent legitimate business reason for its conduct. If, for instance, a seller's conduct, even absent identical behavior on the part of its competitors, is contrary to its independent self-interest, that circumstance would indicate that the business practice is "unfair" within the meaning of § 5. In short, in the absence of proof of a violation of the antitrust laws or evidence of collusive, coercive, predatory, or exclusionary conduct, business practices are not "unfair" in violation of § 5 unless those practices either have an anticompetitive purpose or cannot be supported by an independent legitimate reason.

*Ethyl,* 729 F.2d at 140.

Unlike in *Ethyl,* the Commission has not issued an order in this case. Instead, the Commission filed a complaint in district court alleging violations of § 5. In so doing, the FTC has asked this Court to play the equitable role described by the Supreme Court in *Sperry & Hutchinson Co.* Accepting this challenge, this Court cannot find that Abbott engaged in unfair methods of competition within the meaning of § 5.

First, overwhelming evidence shows conclusively that high level AFASS officials on their own cancelled Abbott's first competitive bid and arranged for a second round of bidding which resulted in the adoption of an open market system. Puerto Rican government officials fought going sole source in 1990. They preferred the open market system for their own budgetary and policy rea-sons. They made every effort to bring it about and were successful in doing so.

Second, the evidence is clear that officials of the United States Department of Agriculture were fully aware of the inappropriate action taken by AFASS to defeat a sole source system. Despite this knowledge, USDA officials failed to act to assure an open and honest competitive bid system. Instead, the flawed noncompetitive second bid was actually tabulated and verified by the USDA. The USDA was fully capable of putting an end to AFASS's improper conduct at the very moment it was engaged in such acts. The Department elected not to act because of "political" considerations. Instead the government allowed an improper procurement to go into effect, costing the U.S. Government millions of dollars of excess costs. As a court of equity, it would be unconscionable to require Abbott to "bail out" the Government by underwriting the losses of this failed procurement program.

The FTC is essentially asking this Court to penalize Abbott for not doing the USDA's job. The Court asks this question: what should Abbott have done that would not have subjected it to liability? Abbott was faced with the Puerto Rican Government's strong bias against a sole source procurement system. Should Abbott have taken on the Government of Puerto Rico by instituting a lawsuit challenging its action? The Court thinks not. Under the circumstances of the case, a U.S. business entity cannot be faulted and accused of unfair trade practices for failing to sue a U.S. Government territory.

The documents and testimony demonstrate that Abbott's managers in formulating their second bid were uncertain as to a number of important issues. Abbott did not know whether the USDA would cancel the second round of bidding. Abbott did not know for certain whether Mead or Wyeth would bid competitively on the second round. Abbott submitted the "no bid" to maximize its options and even possibly potential earnings. Abbott remained prepared to defend its initial competitive $1.106 bid in the event that either of the above-mentioned possibilities occurred. They did not occur, and the open market system was instituted. The Court

believes that the biased actions of the AFASS officials, the alleged collusion of Abbott's competitors, and the inaction of the USDA, all combined to put Abbott in an untenable position.

This lawsuit is really about who should bear the cost of what happened during the failed 1990 Puerto Rico WIC procurement. It is a story of two government programs, one Federal and one Puerto Rican, which interacted in a peculiar way, giving incentives to the officials of Puerto Rico's Department of Health to manipulate the federal WIC program to serve the competing public health budgetary priorities of Puerto Rico. The Court is unwilling to impose the costs of this curious interaction between government programs on Abbott. The Court finds that the USDA looked into the situation at the time, decided not to act, and allowed the open market to prevail in Puerto Rico. The Court will not grant relief to the plaintiff on this basis.

As a postscript, it must be pointed out that the Court does not fault the FTC for bringing this action. It has behaved admirably. It can be proud of its lawyers who presented the FTC's case. Because of what took place in this case, the Court believes the FTC had little choice but to bring the case and allow the facts to receive a public airing.

There is little doubt in this Court's view that violative conduct occurred. By Wyeth and Mead's settlement of the charges against them, without a trial, the good work of the FTC has largely gone unnoticed. In this unfortunate factual pattern, the FTC clearly emerges as an able protector of the public interest. Although it was not able to sustain its case against Abbott, a full record has been developed for all to see how the FTC has discharged its responsibilities.

Just as the FTC counsel ably represented the Commission so have counsel for Abbott ably represented their client. From the beginning, Abbott's posture was that it had nothing to hide and turned over all its information and records to the FTC. As part of its cooperation, Abbott waived all its legal privileges including its extremely important and sensitive attorney-client privilege.

What is more, Abbott's counsel, while vigorously representing their client, at no time took any action to prevent the FTC and the Court from obtaining all the relevant and material facts. Abbott's conduct was a model of how a responsible major public corporation should act under investigation by a government agency. From the Court's point of view because of the high quality of counsel for both parties, the case was a pleasure to try.

An appropriate order accompanies this opinion.

### FINAL JUDGMENT

For the reasons stated in the foregoing memorandum opinion, it is hereby **ORDERED** that judgment be entered for the Defendant, Abbott Laboratories, on all causes of action.