IN THE COURT OF APPEALS OF TENNESSEE
AT NASHVILLE
May 8, 2007 Session

# ROSS PRODUCTS DIVISION ABBOTT LABORATORIES v. STATE OF TENNESSEE

**Appeal from the Tennessee Claims Commission**
**No. 20050189**

---

**No. M2006-01113-COA-R3-CV - Filed December 5, 2007**

---

A manufacturer of infant formula entered into a contract with the State of Tennessee to furnish large quantities of its products to retailers for the federally-funded WIC program. The contract included a cash rebate which the manufacturer agreed to pay the State for each can furnished, to offset the cost of administering the program. After operating under the contract for four years, the manufacturer unilaterally decided to reduce the size of the cans it was providing, and it asked the state to reduce the rebate proportionally. The State refused, citing a provision in the contract that precluded rebate reductions. The manufacturer then filed an administrative claim, asking for a $1.2 million refund of its alleged overpayment of rebates. The Claims Commissioner granted Summary Judgment to the State. We affirm the Commissioner's judgment.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Tennessee Claims Commission Affirmed**

PATRICIA J. COTTRELL, J., delivered the opinion of the court, in which WILLIAM C. KOCH, JR., P.J., M.S., joined. WILLIAM B. CAIN, J. not participating.

Peter H. Curry, Nashville, Tennessee, for the appellant, Ross Products Division Abbott Laboratories.

Robert E. Cooper, Jr., Attorney General and Reporter; Janie C. Porter, Senior Counsel, for the appellee, State of Tennessee.

## OPINION

### I. BACKGROUND

The contract whose interpretation is at the center of this dispute was awarded through a competitive bidding process. On May 6, 1999, the State of Tennessee published a detailed Invitation to Bid (ITB) for a contract to furnish retailers with cans of infant formula that would then be purchased by vouchers issued to individuals enrolled in the Special Supplemental Nutrition Program

for Women, Infants and Children (WIC).[1] Retailers participating in the program could then submit these vouchers to the State and be reimbursed for the full retail price of the product.

The ITB requested that bidders communicate their "best full truckload national wholesale price" as well as an offer of a rebate for each can purchased through the program. The cash rebate was to be paid to the State on a monthly basis to offset the program's administrative cost. The ITB declared that "an award shall be made to the lowest responsive and responsible bidder based on the lowest net monthly wholesale cost to the state for milk based formula." The parties agree that the "lowest net monthly wholesale cost" was arrived at by considering both the wholesale price and the per can rebate.[2]

Once a bid was accepted by the State, the original ITB together with the winning bidder's response became the contract between the State and the winning bidder. Ross Products Division of Abbott Laboratories ("Ross" or "the manufacturer") was the low bidder, and was awarded the contract. The contract ran for one year, but was renewable. Ross's performance was apparently satisfactory, at least initially, for the contract was extended annually over the next four years.

On June 16, 2003, Ross notified the State that it would be replacing its Similac 14.1 ounce can and its Isomil powder 14 ounce can with infant formula packaged in 12.9 ounce cans,[3] starting in October. The manufacturer indicated that "consistency across all items" was the purpose of the move. Ross notified the State that the rebate would need to be reduced to reflect the change and suggested a methodology to compute the reduced rebate during the transition period while the discontinued infant formula cans were being replaced with cans of the smaller size.

An exchange of e-mails about Ross's proposal followed, with the company's manager for government operations asking the State for its assent to the proposed transition plan and several State officials responding that they were not certain that any reduction in the rebate was contemplated under the contract. Finally, on December 31, 2003, purchasing administrator Sondra Howe of the

---

[1] "The WIC program is designed to provide supplemental foods (including infant formula) and nutrition education to women, infants and children (up to their fifth birthday) who have income levels so low as to put them at nutritional risk. 42 U.S.C. §§ 1786-1788 (1988). WIC is funded by the federal government, but the implementation of the program is left to the states." *F.T.C. v. Abbott Laboratories,* 853 F.Supp. 526, 527 (D.D.C.,1994). *See also Valesky's Market v. Department of Health*, 779 A.2d 1251, 1253 (Pa. Commonwealth 2001).

[2] The State declared in the ITB that it could not determine with precision the exact number of units that would be purchased under the program, but it estimated on the basis of the program's past history that the demand for various kinds of infant formula under the contract (concentrate, powdered and ready-to-feed) would amount to 962,500 cans per month.

[3] We note that under the WIC program, mothers are entitled to receive vouchers for no more than 128 ounces of formula per month, which means they would receive no more than nine cans per month under the program whether those cans contained 14.1, 14.0 or 12.9 ounces each. If the cans contained 14.1 ounces, a mother who used the vouchers for the full number of cans for which her infant was eligible would receive 126.9 ounces of formula. If the cans contained 14 ounces, such a mother would receive 126 ounces for her infant. But if the can contained 12.9 ounces, she would receive only 116.1 ounces of formula under the program.

Tennessee Department of General Services sent a letter to Ross informing it that the State was rejecting the request that it reduce the rebate because such a reduction was not consistent with the terms of the contract.

## II. ADMINISTRATIVE PROCEEDINGS

On November 3, 2004, Ross Laboratories filed a claim with the Division of Claims Administration. The company contended that the State had breached its contract by refusing to reduce the rebate the company was obligated to pay, and it asked to be reimbursed for what it deemed to be its overpayments, in the amount of $1.2 million dollars. The claim was subsequently transferred to the Claims Commission pursuant to Tenn. Code Ann. § 9-8-402(c).

The State filed an Answer to the manufacturer's claim, followed by a motion for summary judgment. The motion was argued before the Claims Commissioner on January 18, 2006. The Commissioner's order, filed on April 24, 2006, included a recitation of the undisputed facts and a detailed analysis of the contract at issue. The Commissioner noted that Clause 11 of the ITB stated that in the event of an increase in the manufacturer's price, there would be an automatic increase in the rebate by the same amount, but that if the manufacturer reduced its price, the rebate would remain unchanged. After discussion of that clause and of the basic principles of contract construction, the Commissioner granted summary judgment to the State on the ground that its refusal to adjust the amount of its rebate was not a breach of the contract. Ross Laboratories then filed a direct appeal to this court pursuant to Tenn. R. App. P. 12.

## III. ANALYSIS

### A. The Standard of Review

Summary judgment is an appropriate vehicle for resolving disputes if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Tenn. R. Civ. P. 56.04; *Blair v. West Town Mall*, 130 S.W.3d 761, 764 (Tenn. 2004); *Pero's Steak & Spaghetti House v. Lee*, 90 S.W.3d 614, 620 (Tenn. 2002)*; Byrd v. Hall*, 847 S.W.2d 208, 210 (Tenn. 1993).

In the present case, the facts are undisputed, and thus the only issue before this court involves the proper construction of the contract between the State and Ross. Questions of contract interpretation are generally considered to be questions of law, and thus are especially well-suited for resolution by summary judgment. *See Doe v. HCA Health Services of Tennessee,* 46 S.W.3d 191, 196 (Tenn. 2001); *Guiliano v. Cleo*, 995 S.W.2d 88, 95 (Tenn. 1999); *Hamblen County v. City of Morristown*, 656 S.W.2d 331, 335-36 (Tenn. 1983).

The cardinal rule for interpretation of contractions is to ascertain the intention of the parties from the contract as a whole, and to give effect to that intention consistent with legal principles. *Planters Gin Co. v. Fed. Compress & Warehouse Co.*, Inc., 78 S.W.3d 885, 890 (Tenn. 2002); *Bob Pearsall Motors Inc., v. Regal Chrysler-Plymouth*, Inc., 521 S.W.2d 578, 580 (Tenn. 1975); *Rainey*

*v. Stansell*, 836 S.W.2d 117, 118 (Tenn. Ct. App. 1992). The intent of the parties is presumed to be embodied and expressed in the contract as written. *Planters Gin Co.*, 78 S.W.3d at 890; *Rainey v. Stansell*, 836 S.W.2d at 118. Accordingly, the court's role in resolving disputes regarding the interpretation of a contract is to ascertain the intention of the parties based upon the usual, natural, and ordinary meaning of the language used. *Memphis Housing Authority v. Thompson*, 38 S.W.3d 505, 511 (Tenn. 2001); *Guiliano v. Cleo*, 995 S.W.2d at 95; *Bob Pearsall Motors v. Regal Chrysler-Plymouth* 521 S.W.2d at 580.

A trial court's interpretation of a contractual document is not entitled to a presumption of correctness on appeal.[4] *Barnes v. Barnes,* 193 S.W.3d 495, 498 (Tenn. 2006); *Angus v. Western Heritage Ins. Co.*, 48 S.W.3d 728, 730 (Tenn. Ct. App. 2000). This court must review the document *de novo*, and we must make our own determination regarding its meaning and legal import. *Hillsboro Plaza Enterprises v. Moon*, 860 S.W.2d 45, 47 (Tenn. Ct. App. 1993).

## B. The Terms of the Contract

Ross argues that the State breached its contract by refusing to reduce the rebate that the manufacturer was obligated to pay. There is nothing in the contract that specifically allows for a reduction in the rebate. To the contrary, Clause 11 of the ITB, which sets out the effect on the rebate of two different kinds of price changes, appears to preclude such a reduction. That clause, which is captioned "Price List Adjustment" reads in relevant part as follows:

> Manufacturer's industry-wide price increases in the best full truckload national wholesale price per can of milk-based, iron fortified formulas will result in an automatic rebate increase on a cent for cent basis for such formulas, taking effect on or after the first day of the month of any such increase in the manufacturer's best full truckload national wholesale price per can.

> The per can rebate for milk-based, iron-fortified formulas will increase the same number of cents as any increase over the best truckload national wholesale price per can. **A decrease in the best full truckload national wholesale price shall not result in a decrease in the per can rebate for milk-based, iron-fortified formulas.**

Clause 11 does not prohibit the manufacturer from raising its wholesale prices. Nonetheless, by increasing the rebate on a cent for cent basis for any such increase, it prevents the manufacturer from making any additional profit from such an action. Conversely, a reduction in the wholesale price leaves the rebate unchanged. However, Ross argues that since Clause 11 refers to the effects on the rebate of the manufacturer's industry-wide price changes, it should not apply where a change in price occurs solely because of a change in the size (or more accurately, the capacity) of the can

---

[4] Proceedings on the Claims Commission's regular docket are conducted pursuant to the Tennessee Rules of Civil Procedure. *See* Tenn. Code Ann. § 9-8-403(a)(1). Accordingly, the "trial court" in this opinion is the Claims Commission. *See Turner v. State of Tennessee,* 184 S.W.3d 701, 704 (Tenn. Ct. App. 2006); *Learue v. State of Tennessee*, 757 S.W.3d 3, 6 (Tenn. Ct. App. 1987).

containing its product.[5] However, no provision in the contract specifically authorized Ross to unilaterally reduce the size of the cans it furnished. Regardless of the cause of the price reduction, which is the reason for Ross's request to reduce the rebate, we find Clause 11 applies and prevents the requested reduction.

Ross suggested at oral argument that we should not place much weight on Clause 11 because, as the party that drafted the ITB, the State gave bidders no opportunity to negotiate over its terms. The manufacturer implied that we should treat the contract as a contract of adhesion, which is construed against the drafting party because of the disparity in bargaining power between the parties. *Vargo v. Lincoln Brass Works*, 115 S.W.3d 487, 492 (Tenn. Ct. App. 2003).

We find that argument to be without merit. An adhesion contract is a "[s]tandardized contract form offered to consumers of goods and services on essentially 'take it or leave it' basis without affording consumer realistic opportunity to bargain and under such conditions that consumer cannot obtain desired product or services except by acquiescing in form contract." Black's Law Dictionary 40 (6th Ed. 1990).

Contracts of adhesion often arise from transactions between relatively uneducated or powerless members of the public on one side, and knowledgeable professionals or powerful companies on the other. *See, for example, Taylor v. Butler*, 142 S.W.3d 277 (Tenn. 2004) (arbitration clause in sale by used car dealer); *Alcazar v. Hayes*, 982 S.W.2d 845 (Tenn. 1998) (uninsured motorist clause in insurance contract); *Russell v. Bray,* 116 S.W.3d 1 (Tenn. Ct. App. 2003) (exculpatory clause in home inspection contract); *Howell v. NHC Healthcare-Fort Sanders*, 109 S.W.3d 731 (Tenn. Ct. App. 2003) (arbitration clause in contract between nursing home and illiterate and gravely ill patient). There was no such disparity in bargaining power here.

Putting aside the question of whether Ross or the sophisticated business persons who prepared the infant formula bid for the manufacturer should be considered "consumers of goods and services" under the above definition, we note that a contract of adhesion is not necessarily unenforceable. It is only unenforceable if "the terms of the contract are beyond the reasonable expectations of an ordinary person, or oppressive or unconscionable." *Taylor v. Butler*, 142 S.W.3d at 286; *Howell v. NHC Healthcare-Fort Sanders*, 109 S.W.3d at 734 (citing *Buraczynski v. Eyring*, 919 S.W.2d 313, 320 (Tenn. 1996)).

We can see nothing in the bidding process or in the contract terms to indicate oppressiveness or unconsciousability. Ross chose to bid on the contract with full knowledge of its rebate provisions. We presume it would not have done so if it did not believe that the advantage to be gained from being the sole supplier of infant formula to the WIC program in Tennessee outweighed any reduction in its profit margin resulting from the rebates it had to pay for the privilege.

---

[5]The parties agree that the reduction in can size has resulted in a corresponding reduction in the wholesale per can price which retailers must now pay for the product.

Further, since Ross unilaterally chose to change the size of the product it was furnishing, it should not be heard to complain that the State's refusal to reduce the manufacturer's rebate obligation was beyond its reasonable expectations. To the contrary, it appears to us that by demanding that the State reduce the rebate, Ross was attempting to change its bid after the fact, a move which if successful would have been unfair both to the other bidders and to the State, which depends upon the rebate to fund the WIC program. Thus, the contract is enforceable as written.

## C. The Question of Ambiguity

Ross's argument that it is entitled to a rebate reduction rests entirely on a section of the contract which sets out the duties of the winning bidder in the event of a change in the formula supplied:

> In the event the contractor introduces a formula designed to replace or be an alternative to formula(s) referenced in the contract, the contractor shall provide such formulas at the same net per can wholesale cost as the original formula, with adjustments made for packaging size difference. Any Replacement formula offered by the contractor for a formula that is discontinued would have to be formulated to serve the same population that would have been served by the formula referenced in the contract.

Ross argues that since the State calculated the net per can wholesale cost during the bidding process by subtracting the rebate amount from the price, the above passage impliedly endorses reductions in the rebates applicable to new formulas. Even if we accepted the manufacturer's contention, Ross did not introduce a new formula, and it therefore concedes that the above passage is not directly applicable to the situation before us. Nonetheless, Ross argues that the above provision, read in conjunction with Clause 11, shows that the contract is ambiguous, and thus that it should be allowed to offer evidence as to what should occur if the manufacturer reduces its packaging size. We do not agree.

As we noted above, the court's role in resolving disputes regarding the interpretation of a contract is to ascertain the intention of the parties based upon the usual, natural, and ordinary meaning of the language used. Where the language of the contract is clear and unambiguous, its literal meaning controls the outcome of contract disputes. *Planters Gin Co.*, 78 S.W.3d at 890. When the language is ambiguous, however, the courts must resort to other evidence to determine the intention of the parties.

Nonetheless, an ambiguity does not arise in a contract merely because the parties may differ as to the interpretation of certain of its provisions. *Trinity Industries v. McKinnon Bridge*, 147 S.W.3d 225, 234 (Tenn. Ct. App. 2003) (citing *Oman Construction Co. v. Tennessee Valley Authority,* 486 F.Supp. 375, 382 (M.D. Tenn. 1979)). Neither the parties nor the courts may create an ambiguity where none appears in the contract. *Edwards v. Travelers Indemnity Insurance,* 300 S.W.2d 615 (Tenn. 1957). A strained construction may not be placed on the language used to find an ambiguity where none exists. *McGee v. Best,* 106 S.W.3d 48, 63 (Tenn. Ct. App. 2002) (*citing Empress Health & Beauty Spa, Inc. v. Turner,* 503 S.W.2d 188, 190-91 (Tenn.1973)).

We must consider the agreement as a whole in determining whether the meaning of the contract is clear or ambiguous. *Warren v. Metropolitan Gov't of Nashville and Davidson County*, 965 S.W.2d 618, 623 (Tenn. Ct. App. 1997); *Gredig v. Tennessee Farmers Mutual Ins. Co.*, 899 S.W.2d 909, 912 (Tenn. Ct. App. 1994). Further, "[u]nder Tennessee law, it is presumed that a written contract contains the entire agreement between the parties." *Simonton v. Huff,* 60 S.W.3d 820, 826 (Tenn. Ct. App. 2000). Thus, the contract at issue can not be considered ambiguous just because it doesn't include a term or a contingency that Ross wishes it contained.

The ITB defines a rebate as an "amount payable to Tennessee Department of Health for each can of infant formula purchased with a negotiable food instrument." Almost every other mention of the rebate in the contract documents refers to it as a "rebate per can." Ross does not allege that its own bid included a sliding or variable amount of rebate depending on the size of the can provided, or that the ITB allowed for such a bid. The only section of the ITB which directly addresses the possibility of change in the rebate allows for the possibility of an increase, but precludes a decrease. Thus, even though the contract does not explicitly discuss the effect on the rebate of the manufacturer's unilateral decision, that does not makes the contract ambiguous. We accordingly affirm the decision of the Claims Commissioner.

## IV.

The judgment of the Claims Commissioner is affirmed. We remand this case to the Claims Commission for any further proceedings necessary. Tax the costs on appeal to the appellant, Ross Products Division of Abbott Laboratories.

<br>

_____
PATRICIA J. COTTRELL, JUDGE